# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43741

ROCKY W. FLETCHER and DELORES L. FLETCHER, husband and wife,

      Plaintiffs-Appellants,

v.

LONE MOUNTAIN ROAD ASSOCIATION, an Idaho Unincorporated Non-Profit Association; ALAN K. SIMS, individually; EDWARD J. SITAR, an individual; LOU ANN STAMP, an individual; EUGENE DEPAULIS, an individual; RICK M. PICCININI, an individual; KATHLEEN STONE, an individual; THOMAS D. VALENZUELA, an individual; DANIEL D. GREGG, an individual; ROY STULTS and JANE DOE STULTS, husband and wife; ANDREW J. PONDER and JANE DOE PONDER, husband and wife; ROBERT L. IMPERATRICE and JANE DOE IMPERATRICE, husband and wife,

      Defendants-Respondents,

and

DOUGLAS B. GRANT and JANE DOE GRANT, husband and wife; CCM, LLC, an Idaho Limited Liability Company; BRIAN REED, an individual; LINDA D. SUTLIFF, an individual; RAWLAND L. AHLMAN, Trustee of the RAWLAND L. AHLMAN LIVING TRUST and CHERYL A. WILSON, Trustee of the NORMA A. AHLMAN MARITAL TRUST; JANET L. RICHMOND, an individual; GARY A. WILSON and JANE DOE WILSON, husband and wife; and JOHN K. MOATS and JANE DOE MOATS, husband and wife; and THE ESTATE OF RYAN C. WELLS,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Wallace, April 2017 Term

2017 Opinion No. 71

Filed: June 21, 2017

Karel A. Lehrman, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County, Hon. Charles W. Hosack, Senior District Judge.

The judgment of the district court is <u>affirmed</u> in part, <u>reversed</u> in part, and the case is <u>remanded</u> for entry of a judgment consistent with this opinion.

James, Vernon & Weeks, P.A., Coeur d'Alene, for appellants. Susan P. Weeks argued.

Ramsden, Marfice, Ealy & Harris, LLP, Coeur d'Alene, for respondents Sims and Ponders. Michael E. Ramsden argued.

Owens, McCrea & Linscott, PLLC, Hayden, for respondents Lone Mountain Road Association, Valenzuela, Stults and Imperatrice.

Witherspoon Kelley, Coeur d'Alene, for respondents Stamp and DePaulis.

Edward Sitar, Athol, pro se respondent.

Rick M. Piccinini, Athol, pro se respondent.

Kathleen Stone, Athol, pro se respondent.

Daniel Gregg, Athol, pro se respondent.

HORTON, Justice.

Rocky and Delores Fletcher ("the Fletchers") appeal from the judgment of the district court in Kootenai County. The Fletchers' action sought a declaratory judgment outlining the rights and responsibilities of property owners in the Twin Lakes Meadows Subdivision ("Subdivision") with respect to a private road known as Lone Mountain Road ("Subdivision Road" or "the Road"). The district court determined that the Subdivision's Covenants, Conditions, and Restrictions ("CC&Rs") were ambiguous and contrary to Idaho easement law. After finding that the CC&Rs were ambiguous, the district court declared that all lot owners who used the Road had the right to make reasonable repairs to the Road. The Fletchers appeal, arguing that the district court erred when it found the CC&Rs to be ambiguous and that they should be strictly applied. The Fletchers also argue that the district court erred when it failed to declare that dust from the Road created an additional burden on their servient estate and by

2

failing to declare that the Lone Mountain Road Association had no right to maintain the Road or to collect assessments. We affirm in part, reverse in part and remand for further action by the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1981, S&S Drilling and Development Company ("S&S") owned and developed a parcel of property in Kootenai County that would become the Subdivision. S&S recorded the Subdivision CC&Rs on June 22, 1981. All lots located within the Subdivision are subject to the CC&Rs, which "shall run with the land and shall be perpetually binding upon [S&S] and its successors-in-interest and assigns, and all parties having or acquiring any right, title, or interest in or to any part of the Property."

The Subdivision was platted in two phases and the district court referred to the separate platted parcels as "the Surveyed Property" and "the Eastern Property." When the CC&Rs were recorded, only the Surveyed Property had been platted. The Eastern Property was subsequently platted in 1983. The Surveyed Property comprises eighteen lots, eleven of which adjoin the Subdivision Road. The Eastern Property consists of eight lots which are all connected to the Road.

The Subdivision Road was initially cleared, graded, and graveled by S&S but the CC&Rs provide that it is to be maintained by the lot owners. The Road runs to the east through the Subdivision from the intersection with Ramsey Road, a county road which runs north and south on the western boundary of the Subdivision. The right-of-way for the Subdivision Road is sixty feet wide. The parcels on the north and south sides of the Subdivision Road are each subject to express easements providing thirty foot strips of land for the Subdivision Road. The Road gives several Subdivision lot owners access to their parcels.

The Subdivision Road originally extended through the Surveyed Property. In 1987, the Road was extended into the Eastern Property, where it comes to a dead end.

The Fletchers purchased Lot 4 in the Surveyed Property in 1981. The Fletchers' lot is located on the north side of the intersection of the Subdivision Road and Ramsey Road. Although various associations for road maintenance have been formed over the years, none of the associations have been created in conformity with the provisions of the CC&Rs. A defendant in this action, Lone Mountain Road Association ("the Association"), was formed as an informal association in 2006. In September 2009, owners of 9 lots entered into a "Mutual Repair and

3

Maintenance Agreement" formalizing their commitment to the Association. The agreement stated that all participants would "mutually share the cost of repair and maintenance of Lone Mountain Road." The agreement also provided that the Association "shall exclusively govern the future actions and responsibilities of the [signatories] related to the repair and maintenance of Lone Mountain Road." Alan Sims, the owner of a lot in the Eastern Property, became president of the Association. The Fletchers, as well as a majority of the other parcel owners in the Subdivision, do not belong to or participate in the Association.

Historically, maintenance of the Subdivision Road (including snow removal) has been performed by lot owners and the Association. Delores Fletcher suffers from asthma which is aggravated by dust from the Road. In the past, the Fletchers, have oiled the first 200 feet of the Subdivision Road at their own expense for dust control. In 2008, the Fletchers applied asphalt grindings to the Subdivision Road for dust control. Following the record-setting winter of 2008, the asphalt grindings began to break up making it difficult for some vehicles to travel the Subdivision Road. In the spring of 2009, Sims, acting as president of the Association, hired a contractor to cover the asphalt grindings with gravel and to grade the Subdivision Road. In May 2009, the Association sent the Fletchers a letter which demanded that the Fletchers not oil the Subdivision Road. The letter stated that if the Fletchers did apply road oil, the Association would remove and/or cover it.

In response to the letter, the Fletchers filed this action seeking a declaration of the rights and obligations of lot owners with regard to the Subdivision Road. On November 16, 2011, the Fletchers filed their amended complaint against the Association and the owners of lots that fronted the Subdivision Road. This complaint named the Association and the owners of nineteen parcels fronting the Subdivision Road as defendants.[1]

A bench trial was held from March 30–April 3, 2015. The district court found that five of the nineteen defendants who owned property fronting the Subdivision Road had never used the Road. The district court further found that the remaining lot owners had waived any right to seek contribution from these lot owners for maintenance unless they used the Subdivision Road in the future. The district court found that the CC&Rs were ambiguous as to maintenance and contribution requirements. The district court found that the each of the fourteen lot owners who

---

[1] The Amended Complaint named twenty-two lot owners as defendants, but three were dismissed from the action because their property was not within the Subdivision and they had no claim to the easement.

4

used the Subdivision Road had the right to make repairs and perform maintenance on the Road but that there was no right to contribution from any other lot owner unless the maintenance was approved by a two-thirds vote of the fourteen lot owners who used the Subdivision Road. The Fletchers timely appealed from the judgment of the district court.

## II. STANDARD OF REVIEW

"When a court interprets a restrictive covenant, it is to apply generally the same rules of construction as are applied to any contract or covenant." *Brown v. Perkins*, 129 Idaho 189, 192, 923 P.2d 434, 437 (1996). "Where contract terms are clear and unambiguous, the interpretation of the contract's meaning is a question of law." *Id.* "On the other hand, where the terms of a contract are ambiguous, the interpretation of the contract's meaning is a question of fact." *Id.* "The preliminary question of whether a contract is ambiguous, is a question of law over which this Court exercises free review." *Id.* "To determine whether there is an ambiguity in the Restrictive Covenants . . . this Court must determine whether the provisions are reasonably susceptible to conflicting interpretations." *Id.* at 193, 923 P.2d at 438. "[B]ecause restrictive covenants are in derogation of the common law right to use land for all lawful purposes, the Court will not extend by implication any restriction not clearly expressed." *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 363, 93 P.3d 685, 694 (2004). "[A]ll doubts are to be resolved in favor of the free use of land." *Id.*

## III. ANALYSIS

**A.  The district court erred when it found that the CC&Rs are ambiguous.**

The main issue on appeal is whether the district court erred when it found the CC&Rs were ambiguous. The following articles of the CC&Rs are pertinent to this issue:

> 1.6 "Subdivision Road" shall mean and refer to the road which is initially cleared, graded, and graveled by Declarant in connection with the subdivision of the Surveyed Property, and which may, in Declarant's discretion be extended in connection with the subdivision of the Eastern Property. The Subdivision Road shall be used to provide access to certain of the Parcels from Ramsey Road, and shall be privately maintained according to this Declaration.
> . . .
> 2.3 <u>Maintenance of Subdivision Street</u>.
> Except for the initial grading and graveling of the Subdivision Road, Declarant shall have no responsibility for the maintenance or repair of the Subdivision Road. *Each Owner of a Parcel which is bound by the Subdivision Road* (including Parcels which are also bounded by a public road) *shall contribute a pro-rata share of the cost of maintaining and repairing the Subdivision Road, based upon*

5

*the [percentages] set forth on Exhibit B[2] attached hereto* and incorporated herein by this reference. *All decisions with respect to the maintenance, repair or improvement of the Subdivision Road shall be made by the Owners of Parcels responsible therefor,* and such decisions shall require the vote of the Owners having two-thirds (2/3) of the maintenance responsibility according to Exhibit B. Decisions made by such a two-thirds (2/3) majority shall be binding upon all such Owners, and each Owner's share of any such costs shall be a lien against his Parcel, enforceable as a mortgage by any other Owner or Owners.

. . .

4.4 Road Maintenance.

Notwithstanding anything to the contrary set forth above or voted upon by the Owners, the pro-rata allocation of maintenance expenses for the Subdivision Road shall be as provided elsewhere in this Declaration; further, no Parcel which is not bounded by the Subdivision Road shall have any maintenance responsibility for the Subdivision Road.

(emphasis added). Appendix B to the CC&Rs explained the financial obligations of lot owners in the Eastern Property after the Road was extended:

Upon extension of the Subdivision Road into the Eastern Property, the Lot Owners having Parcels fronting on the Subdivision Road within the Eastern Property shall have full responsibility for the maintenance, repair and improvement of that portion of the Subdivision Road which lies within the Eastern Property. Unless [S&S] records a specific Declaration setting forth the allocation of such expense, each such Owner (within the Eastern Property) shall contribute a pro-rata share of the expenses based upon the lineal frontage of his

---

[2] Exhibit B, relating only to lots in the Surveyed Property, provided that lot owners would be responsible for the cost of maintenance in proportion to the length of Road frontage adjoining their lots. It provides:

EXHIBIT B
Pro-rata Allocation of Maintenance Expense for
Subdivision Road

| Parcel No. Per Survey | Percentage of Maintenance Obligation |
|---|---|
| 4 | 12.50% |
| 5 | 6.25% |
| 6 | 6.25% |
| 7 | 6.25% |
| 8 | 6.25% |
| 9 | 6.25% |
| 10 | 6.25% |
| 11 | 12.50% |
| 12 | 12.50% |
| 13 | 12.50% |
| 14 | 12.50% |
| | 100% |

Parcel on the Subdivision Road, as compared to the total lineal frontage of all such Parcels.

The district court found the maintenance provisions of the CC&Rs to be ambiguous because they were subject to more than one reasonable interpretation. The district court identified one reasonable interpretation as providing that lot owners adjoining the Road in both the Surveyed Property and the Eastern Property would share the total cost of road maintenance in direct proportion to their property's frontage. The second interpretation was that lot owners in the Surveyed Property would share the cost of maintenance of the portion of the Subdivision Road located within the Surveyed Property and the lot owners in the Eastern Property would be responsible for a proportion share of the cost of maintenance of the Subdivision Road located in the Surveyed Property and exclusively responsible for the maintenance of the portion of the Subdivision Road situated within the Eastern Property. We disagree because the first interpretation identified by the district court was not a reasonable interpretation of the provisions of the CC&Rs.

"[A] covenant is ambiguous when it is capable of more than one reasonable interpretation on a given issue." *Pinehaven Planning Bd. v. Brooks*, 138 Idaho 826, 829, 70 P.3d 664, 667 (2003). "[I]n determining whether a contract is ambiguous, our task is to ascertain whether the contract is reasonably subject to conflicting interpretation." *Bondy v. Levy*, 121 Idaho 993, 997, 829 P.2d 1342, 1346 (1992). "If the covenants are unambiguous, then the court must apply them as a matter of law." *Pinehaven Planning Bd.*, 138 Idaho at 829, 70 P.3d at 667.

Article 2.3 of the CC&Rs expressly provides that "[e]ach Owner of a Parcel which is bound by the Subdivision Road shall contribute a pro-rata share of the cost of maintaining and repairing the Subdivision Road, based upon the percentages set forth on Exhibit B. . . ." Exhibit B identifies only lots within the Surveyed Property. However, Exhibit B describes the lot owners' responsibilities following extension of the Road into the Eastern Property. Upon that occurrence, "the Lot Owners having Parcels fronting on the Subdivision Road within the Eastern Property shall have full responsibility for the maintenance, repair and improvement *of that portion of the Subdivision Road which lies within the Eastern Property*." (emphasis added). The exhibit sets forth the method of allocating the cost of maintaining the Road within the Eastern Property: "[E]ach Owner (within the Eastern Property) shall contribute a pro-rata share of the

7

expenses based upon the lineal frontage of his Parcel on the Subdivision Road, as compared to the total lineal frontage of all such Parcels.

In our view, the express terms of Article 2.3, Article 4.4 and Appendix B are simply not consistent with an interpretation that the owners of lots adjoining the Road bear a proportional cost of maintenance of the entire Subdivision Road. To the contrary, the CC&Rs unambiguously bifurcate maintenance responsibility for the portions of the Road located on the Surveyed Property and the Eastern Property between the adjoining lot owners in the two phases of the Subdivision. The district court rejected the literal language of the CC&Rs, explaining:

> Exhibit B states that the Lots in the Surveyed Property have one hundred percent (100%) of the Maintenance Obligation for that portion of Subdivision Road that is within in the Surveyed Property and that the Lots in the Eastern Property have 100% of the Maintenance Obligation for the portion of Subdivision Road in the Eastern Property. While the division of that obligation is pro rata based upon lineal frontage, a literal reading of Exhibit B bifurcates the maintenance obligation of all the dominant easement holders between the Surveyed Property and the Eastern Property.
>
> The bifurcation of maintenance rights and duties is not only contrary to Idaho easement law, but, when the road is a dead end, the result is that the Lots in the Eastern Property have no obligation to maintain that part of Subdivision Road in the Surveyed Property, even though the Lots in the Eastern Property are the dominant holder of an easement for the road across the Surveyed Property.

The district court was correct in its statement of the common law. "The owner of the dominant estate has the duty to maintain the easement even when the servient estate landowner uses the easement." *Beckstead v. Price*, 146 Idaho 57, 66, 190 P.3d 876, 885 (2008). The district court's error, however, was the failure to recognize that parties' freedom to contract allows them to reallocate duties that would otherwise be imposed by law, provided that such a reallocation of duties is not illegal or violate public policy. *See, e.g., Two Jinn, Inc. v. Idaho Dep't of Ins.*, 154 Idaho 1, 5, 293 P.3d 150, 154 (2013). The apportionment of duties and costs of maintenance under the literal terms of the CC&Rs is neither illegal nor does it violate public policy. As courts lack "the roving power to rewrite contracts," *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 362, 93 P.3d 685, 693 (2004), we must give effect to the express provisions of the CC&Rs.

The district court also applied the common law when it held that the owners of dominant estates in both the Surveyed Property and the Eastern Property had the right to perform maintenance on the Subdivision Road, albeit without the right to obtain contribution from other lot owners. In so holding, the district court erred. Article 2.3 expressly provides: "All decisions

8

with respect to the maintenance, repair or improvement of the Subdivision Road shall be made by the Owners of Parcels responsible therefor, and such decisions shall require the vote of the Owners having two-thirds (2/3) of the maintenance responsibility according to Exhibit B." We are obligated to give effect to the unambiguous language in this provision. No maintenance, repair, or improvement can be made to the Subdivision Road within the Surveyed Property without eight[3] owners of parcels adjoining parcels agreeing to do so.

**B. The district court erred when it held that Subdivision property owners had waived any right to seek contribution from lot owners who own property fronting the Subdivision Road but do not use the road.**

There are twenty-six lots in the two phases of the Subdivision, nineteen of which front the Subdivision Road. Eleven of these lots are in the Surveyed Property. The district court found that a total of five lot owners in the Subdivision have never used the Subdivision Road, four of which own lots in the Eastern Property. The district court found that the other lot owners had waived any right of contribution from those lot owners who do not use the Subdivision Road:

> Five (5) of these nineteen (19) lots that front on Subdivision Road have not been involved in the case, other than having been named as indispensable parties. None of these five lots has ever used Subdivision Road over more than 30 years. . . . The fourteen (14) lot owners in this case, who have and do use Subdivision Road have never attempted to assess any fees against the five (5) lots that do not use the road, and, none of the fourteen (14) lot owners have ever asserted that the five (5) lots have any duty to contribute to the maintenance of Subdivision Road. As a result, the Court finds that the fourteen (14) lot owners using Subdivision Road have waived any claim against these five (5) lots, by having conceded over the years that there was no duty to maintain the road when there was no use or claim of use. . . . What easement rights these five (5) lots may retain based upon the recorded plat and the CC&R's, and what responsibilities would apply, should a right to use Subdivision Road be asserted at some point in the future, has not been raised in this case. Nothing herein should be construed . . . that this Court is finding that these five (5) lots have any duty to maintain Subdivision Road, in the continuing absence of any use or claim of use.

In so holding, the district court erred in two respects. First, it treated lot owners in the Surveyed Property and the Eastern Property as one group, instead of the two distinct groups contemplated by the CC&Rs. More significantly, the district court erred in finding that there was any waiver of the right to seek contribution from lot owners who do not use the Road.

---

[3] There are eleven parcels adjoining the Subdivision Road in the Surveyed Property. In order to achieve the two-thirds agreement required by the CC&Rs, eight property owners must be in agreement as to any proposed maintenance, repair or improvement of the Road.

9

"The existence of waiver ordinarily is a question of fact, and if there is any substantial evidence in the record to support a waiver it is for the trier of fact to determine whether the evidence establishes such a waiver." *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 518, 650 P.2d 657, 660 (1982). "[W]aiver is primarily a question of intent." *Id.* at 521, 650 P.2d at 663. Article 2.3 provides in pertinent part:

> All decisions shall be made by the Owners of Parcels responsible therefor, and such decisions shall require the vote of the Owners having two-thirds (2/3) of the maintenance responsibility according to Exhibit B. *Decisions* [with respect to the maintenance, repair or improvement of the Subdivision Road] *made by such a two-thirds (2/3) majority shall be binding upon all such Owners, and each Owner's share of any such costs shall be a lien against his Parcel, enforceable as a mortgage by any other Owner or Owners.*

Article 4.4 provides: "Notwithstanding anything to the contrary set forth above or voted upon by the Owners, the pro-rata allocation of maintenance expenses for the Subdivision Road shall be as provided elsewhere in this Declaration. . . ."

The district court found that "the CC&R's have never been used to invoke a two-thirds vote about maintenance." The district court correctly concluded that there was no right to seek contribution for costs incurred in the absence of a two-thirds vote to undertake maintenance, repair or improvement of the Subdivision Road. Thus, as there was never a circumstance in which a lot owner had an enforceable duty to contribute for the costs of maintenance, there is no factual basis for the district court's conclusion that waiver prohibited other lot owners from enforcing their right of contribution from lot owners who do not use the Road after two-thirds of the relevant lot owners (i.e., the eleven lot owners in the Surveyed Property and the eight lot owners in the Eastern Property) have agreed to such maintenance, repair or improvement.

## C. The district court did not err when it found that road dust does not create an additional burden on the Fletchers' servient estate.

The Fletchers argue that the district court erred when it concluded that dust from the Road did not burden their servient estate. The district court stated: "While dust does not constitute a damage or interference with the servient estate, the servient estate can mitigate dust issues." The Fletchers argue that a dominant estate owner has the duty to maintain the easement so as to not create an additional burden on the servient estate and that dust from the Subdivision Road constitutes an additional burden. Respondents Sims and Ponders reply that the Subdivision Road has been a gravel road as long as the Fletchers have owned the property and thus, dust

10

from the Road cannot constitute an additional burden on the property. We agree with Sims and Ponders.

Idaho law requires the owner of the dominant estate to maintain the easement so as to not create an additional burden on the servient estate. *Gibbens v. Weisshaupt*, 98 Idaho 633, 640, 570 P.2d 870, 877 (1977). "The duty of maintaining the easement rests with the easement owner (i.e., dominant estate), even when the servient landowner uses the easement." *Walker v. Boozer*, 140 Idaho 451, 456, 95 P.3d 69, 74 (2004). "That duty requires the easement owner maintain, repair, and protect the easement so as not to create an additional burden on the servient estate or an interference that would damage the land, such as flooding of the servient estate." *Id.* "This duty to maintain does not mean that the easement owner is required to maintain and repair the easement for the benefit of the servient estate." *Id.* "It follows then, that absent a showing that the easement owners' maintenance of the easement created an additional burden or interference with the servient estate, the servient estate cannot dictate the standard by which the easement should be maintained." *Id.*

The Fletchers direct us to *City of Bellevue v. Daly*, 14 Idaho 545, 94 P. 1036 (1908), for the proposition that a dominant estate owner must maintain an easement so it does not interfere with the servient estate owner's use of their land. In *City of Bellevue*, the city received its drinking water through a ditch which ran through pasture land where Daly kept cattle. *Id*. at 547, 94 P. at 1037. Daly's cattle grazed along the ditch and contaminated the city's drinking water with their excretion. *Id.* The city sought an injunction preventing Daly from running cattle on the land unless he built a fence around the ditch. *Id*. at 548, 94 P. at 1037. The lower court granted the injunction and Daly appealed. *Id.* This Court held that while the City could fence the ditch, it could not require Daly, the owner of the servient estate, to do so. *Id.* at 549–50, 94 P. at 1038. The additional burden discussed in *City of Bellevue* was not interference resulting from the fence, but rather who bore the responsibility for fencing the ditch. As such, *City of Bellevue* is not particularly instructive as to the issue before this Court.

The Subdivision Road has always been a gravel road. The Subdivision Road is described by the CC&Rs as, "[a] road which is initially cleared, graded, and graveled by [S&S] in connection with the subdivision of the Surveyed Property….The Subdivision Road shall be used to provide access to certain of the Parcels from Ramsey Road, and shall be privately maintained according to this Declaration." Because the Subdivision Road was a gravel road when the

11

Fletchers purchased their property subject to the easement, the nature of the Road has not changed and the district court did not err when it found that dust from the Road did not constitute an additional burden on the Fletchers' servient estate.

**D. The district court's failure to declare that the Association had no right to maintain the Subdivision Road or collect assessments.**

The Fletchers contend that the district court erred by failing to address their claim that the Association has no right to maintain the Subdivision Road or collect assessments. The Association has not appeared in this appeal.

The CC&Rs provide the mechanism by which a road maintenance association might be created:

> 4.1 <u>Purpose of Community Association</u>.
> At any time after recordation of this Declaration, and if Declarant (while still an Owner) shall agree in writing, *the owners may form a Community Association,* which may have among other things, *for its purposes, the maintenance and development of roads,* utility systems and other common facilities, the establishment of recreational common areas and facilities, the enforcement of liens, covenants, restriction and easements existing upon or created for the benefit of the Property, and the fostering of acquaintences [sic] and friendships among the Owners.
>
> 4.2 <u>Method of Formation</u>.
> A Community Association formation may be initiated by one or more record owners. Said Owner(s) must give thirty (30) days written notice to all other record owners by registered or certified mail. To those Owners whose addresses are unknown, the last address registered with the Kootenai County Treasurer (or such other person who is responsible for real estate tax notices) shall be used. The notice shall state that said Owner(s) propose to form a Community Association and shall fix a time and place for a meeting of Owners, to be held in Kootenai County, Idaho, not less than ten (10) nor more than forty (40) days after the date of said notice, to vote upon said proposal. Each Owner shall have the right to vote at such meeting in person or by proxy. If three-fourths (3/4) of all record Owners other than Declarant, voting in person or by proxy at a meeting called for such purpose, vote in favor of a Community Association, and if Declarant agrees in writing to the formation of the Association, the Community Association shall be established.

It is evident that the Association was not formed in compliance with these provisions. Our holdings regarding the district court's decision interpreting the CC&Rs and finding a waiver of the right to seek contribution from lot owners that do not use the Road require that we vacate the judgment of the district court and remand for entry of a judgment consistent with this

12

opinion. On remand, the district court shall incorporate into its amended judgment the declaration that the Association has no right to maintain the Subdivision Road or obtain involuntary contributions from lot owners for past expenditures.

**E.  Attorney fees on appeal.**

The only attorney fees request comes from the Fletchers. They sought an award of fees against the Association if it chose to participate in this appeal. As the Association has not done so, we do not award any party attorney fees on appeal. Because we reverse the district court's decision that the CC&Rs are ambiguous and that lot owners have waived the right to seek contribution from those lot owners who do not use the Road, we hold that the Fletchers are the prevailing party.

## IV. CONCLUSION

We reverse the judgment of the district court based upon its findings that the CC&Rs are ambiguous and there was a waiver of the right to obtain contributions from lot owners that do not use the Road. We affirm the district court's judgment that road dust does not create an additional burden on the Fletchers' estate. We remand for entry of an amended judgment consistent with this opinion. The district court shall incorporate into its amended judgment the declaration that the Association has no right to maintain the Subdivision Road or seek involuntary contributions from lot owners for past expenditures. Costs to Fletchers.

Chief Justice BURDICK and Justices EISMANN, JONES and BRODY, **CONCUR**.