# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 47950

JACK S. NELSEN and EMILY
NELSEN, husband and wife;
MATTHEW F. NELSEN and
JANICE C. LEHMAN

  Plaintiffs Appellants,

vs.

JONATHAN F. NELSEN, JACK H.
NELSEN and JOAN C. NELSEN,
husband and wife,

  Defendants/Respondents.

IN RE: DISSOLUTION OF NELSEN
FARMS, LLC.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, September 2021 Term

Filed: April 19, 2022

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Jerome County. Rosemary Emory, District Judge.

The district court judgment is <u>affirmed in part and reversed in part.</u>

Elam & Burke, P.A., Boise, and Givens Pursley, LLP, Boise, attorneys for Appellants. Alexander P. McLaughlin argued.

Parsons Behle & Latimer, Boise, attorneys for Respondents. Slade D. Sokol argued.

---

BEVAN, Chief Justice.

This appeal arises from a family dispute concerning ownership interests in Nelsen Farms, LLC ("LLC"). The LLC, as originally established, included equal ownership for two of the Nelsen's sons, Jack S. and Jonathan. However, in 2015, Jack H. Nelsen ("Jack H.") and Joan Nelsen ("Joan") modified their estate plan to transfer their interests in the LLC to their son, Jonathan, in their wills. In 2017, Jack H. and Joan altered their plans and decided to pass their interests in the LLC to Jonathan via an inter vivos transfer, rather than through their wills. In August 2017, members of the LLC held a special meeting, during which the transfer of Jack H.

1

and Joan's membership interest to Jonathan was approved. The next month, Jack S. Nelsen ("Jack S."), Emily Nelsen, (Jack's wife), Matthew Nelsen, (Jack S. and Emily's son) and Janice Lehman (Jack S.'s sister) (collectively "Appellants"), filed a complaint against Jack H.,[1] Joan, and Jonathan (collectively "Respondents"), alleging Jack H. and Joan were incompetent and lacked testamentary capacity to modify their 2015 wills and to make the 2017 inter vivos conveyance. Appellants also alleged Jonathan unduly influenced Jack H. and Joan to obtain the estate modification. Appellants amended their complaint in October 2017, adding a claim for dissolution of the LLC. The district court entered several interlocutory decisions and orders during the case. Ultimately, in November 2019, the district court granted summary judgment to Respondents and dismissed all of Appellants' claims. Appellants timely appealed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Unless specified otherwise, the following facts are undisputed. On April 26, 2013, Jack S., Emily, Jonathan, Jack H., and Joan formed Nelsen Farms, LLC. The LLC's effective formation date was May 1, 2013, and at that time, under the Operating Agreement, membership percentages in the LLC were: Jack S. (30%); Emily (0%); Jonathan (30%); Jack H. (15%); Joan (25%). Under Section V, 5.1 of the Agreement, Jack S. and Jonathan were designated "Managing Members" with the "authority to operate jointly" in carrying out the day-to-day business of the LLC. Each member's percentage was based on a capital contribution of their respective partnership interest in a separate general partnership—Nelsen Dairy.

On November 26, 2013, the members amended the Agreement to create a membership interest for Jack S. and Emily's son, Matthew F. Nelsen (Matthew). Matthew's membership interest was a gift from Jack H. and Joan, which reduced their membership interests to 14.707% and 24.707%, respectively. Matthew's membership was 0.586%.

On May 5, 2015, Jack H. and Joan met with John O. Fitzgerald, an estate planning and probate attorney, to discuss modifying their estate plans and to prepare new wills. Jack H. and Joan were referred to Fitzgerald by Robert Williams, the LLC's attorney. Fitzgerald discussed with Jack H. and Joan their desires and intentions to pass their respective interests in the LLC to Jonathan, rather than to divide those interests equally between Jonathan and Jack S., as they had done in their

---

[1] Jack H. passed away during the pendency of these proceedings. The original parties to this litigation remain the same.

2

prior wills. Fitzgerald met with Jack H. and Joan again on May 22 to review the new wills and to confirm that the new wills accurately stated their desires and intentions. During both May meetings, Fitzgerald noted Jack H. and Joan's respective legal capacity and competency and offered testimony by affidavit that "[w]ithout question, to a reasonable degree of professional certainty . . . both Joan [ ] and Jack H. possessed the legal capacity and competency to make and execute the new wills on May 22, 2015." Fitzgerald testified similarly about Jack H. and Joan's respective competency to execute documents designating a conservator and guardian on June 16, 2015.

Some months later, in November 2015, Fitzgerald again met with Jack H. and Joan where they discussed and made further modifications to their wills. Fitzgerald testified that both Jack H. and Joan were competent to execute their new wills on November 3, 2015. Fitzgerald also testified that throughout the ensuing 20-month period, he had the "opportunity to evaluate [Jack H. and Joan's] legal capacity, competency and testamentary capacity on numerous occasions." Fitzgerald maintained that during these discussions both Joan and Jack H.

> consistently, and without assistance, prompt or aid, identified their children, their assets and the associated history of those assets, including the history of the family's dairy and farming business and the membership interests in Nelsen Farms, LLC. Both Joan [ ] and Jack H. were, from my first meeting with them, and continued to be adamant about modifying their wills to leave their estate primarily to Jonathan to the exclusion of Jack S. Nothing in either Joan[ ]'s or Jack H's conduct or statements during our meetings indicated lack of the requisite competency or capacity to make the desired changes to their estate plans, or to make cross designations for the appointment of a conservator/guardian.

Fitzgerald further testified that Jonathan was not present during any of his 2015 meetings and discussions with Joan and Jack H. Those meetings occurred on May 20, 2015, May 22, 2015, June 16, 2015, and November 3, 2015.

In May 2017, Joan contacted Fitzgerald by telephone, expressing an interest in making an inter vivos transfer of their interest in the LLC to Jonathan, rather than passing that interest through their wills. Jack H. and Joan also apparently wanted to amend their wills again. On May 30, 2017, Jonathan drove Jack H. and Joan to Fitzgerald's office. This was allegedly the first time Jonathan was informed of his parents' intent to change their estate plan, as Fitzgerald testified that it was during this meeting he informed Jonathan "of his parents' intention to make inter-vivos gifts to him of their membership interests in Nelsen Farms, LLC." Joan and Jack H. executed new wills at that time that remained consistent with their 2015 wills.

3

Throughout June and July 2017, Fitzgerald met with Jack H. and Joan several more times. Fitzgerald also began communicating with Robert Williams. These discussions included the need to call a meeting of the LLC members to present, discuss, and take action to effectuate and confirm the inter vivos gifting of the membership interests. As a result, on July 31, 2017, Williams sent a notice and agenda for a special meeting of the LLC. On August 4, 2017, the special meeting took place at the offices of Williams, Meservy & Lothspeich. Jack H., Joan, Jonathan, Jack S., and Matthew were all in attendance, together with Fitzgerald and Williams. "Gift of the shares" was the only item on the agenda. Respondents, collectively, voted for the motion; Jack S. and Matthew abstained. The motion carried with no dissenting votes cast. On August 21, 2017, Fitzgerald met with Jack H. and Joan to execute a Memorandum of Gift of Membership Interest, which transferred much of their membership interests in the LLC to Jonathan. Following these gifts, the membership percentages in the LLC were modified as follows: Jack S. (30%); Jonathan (67.414%) Jack H. (1%); Joan (1%); Matthew (0.586%). Testifying about these transfers, Fitzgerald explained:

> Each understood why they were executing the memoranda and understood the effect that the memoranda would have with respect to their family, their assets and Nelsen Farms, LLC. There was no evidence that either Jack H. or Joan [ ] lacked the capacity, testamentary or otherwise, to execute, respectively, the Memorandum of Gift of Membership Interest. My professional opinion, to a reasonable degree of professional certainty, is both Joan [ ] and Jack H. were mentally competent to execute, respectively, the Memorandum of Gift of Membership Interest . . . .

On September 12, 2017, Appellants filed a complaint to set aside the gifts and inter vivos transfers of Jack H. and Joan based on allegations of undue influence by Jonathan. The initial complaint asserted six causes of action: (1) undue influence, (2) accounting, (3) declaratory judgment, (4) injunctive relief, (5) constructive trust, and (6) tortious interference with expectancy of inheritance. The same day, Jack S. and Janice also filed a Petition for Appointment of Guardians and Conservators for Jack H. and Joan. In connection with that case, Jack H. and Joan underwent independent competency examinations, which concluded Jack H. had dementia and was not competent to make financial and legal decisions; Joan was deemed competent to handle her affairs. Joan was later appointed guardian for Jack H.

On October 25, 2017, Appellants filed an amended complaint and added a seventh cause of action: dissolution of the limited-liability company. Appellants also moved to compel a mental examination of Joan under I.R.C.P. 35, which the district court denied on December 12, 2018, because it lacked a showing of good cause. Later, on February 6, 2019, Appellants moved for a

4

preliminary injunction to enjoin Jonathan from exercising sole authority over the operation of the LLC in its day-to-day affairs. They also sought to require the LLC's day-to-day management be subject to the joint authority of Jonathan and Jack S. under paragraph 5.1 of the Operating Agreement. On March 4, 2019, Respondents moved for partial summary judgment seeking to have the court dismiss the claims in the amended complaint "regarding the management, business and dissolution of the Company" as a matter of law. On May 10, 2019, the district court issued a memorandum decision and order which denied both Appellants' motion for preliminary injunction and Respondents' motion for partial summary judgment. The district court denied partial summary judgment because factual issues remained regarding whether Jonathan had unduly influenced Jack H. and Joan.

In August 2019, Respondents renewed their motion for summary judgment, this time seeking dismissal as to all claims in the amended complaint. On November 25, 2019, the district court granted the motion and dismissed all seven causes of action after determining Appellants had failed to show a genuine issue of material fact on any of their claims. Appellants now appeal the district court's summary judgment order and its denial of the motion to compel physical and mental examination of Joan.

## II. ISSUES ON APPEAL

1. Did the district court abuse its discretion when it dismissed Appellants' motion for physical and mental examination of Joan?

2. Did the district court abuse its discretion when it dismissed Count Three for declaratory relief as to Jack H.'s testamentary capacity?

3. Were there genuine issues of material fact regarding Appellants' claims for undue influence?

4. Were there genuine issues of material fact that precluded summary judgment as to Appellant's claims for an accounting, for injunctive relief, and the imposition of a constructive trust?

5. Did the district court err in failing to recognize the tort of intentional interference with an expected inheritance?

6. Did the district court err by entering a judicial decree dissolving Nelsen Farms, LLC?

## III. STANDARDS OF REVIEW

This Court employs the same standard as the district court when reviewing rulings on summary judgment motions. *Owen v. Smith*, 168 Idaho 633, 640, 485 P.3d 129, 136–37 (2021) (citing *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 140–41, 456 P.3d 201,

209–10 (2019)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). A moving party must support its assertion by citing particular materials in the record or by showing the "materials cited do not establish the. . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[s]." I.R.C.P. 56(c)(1)(B). Summary judgment is improper "if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented." *Owen*, 168 Idaho at 641, 485 P.3d at 136–37 (quoting *Trumble*, 166 Idaho at 141, 456 P.3d at 210). A "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Id*.

"The admissibility of evidence contained in affidavits and depositions in support of or in opposition to a motion for summary judgment is a threshold question to be answered before applying the liberal construction and reasonable inferences rule to determine whether the evidence is sufficient to create a genuine issue for trial." *J–U–B Engineers, Inc. v. Security Ins. Co. of Hartford*, 146 Idaho 311, 314–15, 193 P.3d 858, 861–62 (2008). "The admissibility of expert testimony, [also], is a threshold matter that is distinct from whether the testimony raises genuine issues of material fact sufficient to preclude summary judgment." *Arregui v. Gallegos-Main*, 153 Idaho 801, 804, 291 P.3d 1000, 1003 (2012) (internal citation omitted). The "liberal construction and reasonable inferences standard does not apply" when determining the admissibility of expert testimony; instead, "the trial court must look at the witness' affidavit or deposition testimony and determine whether it alleges facts which, if taken as true, would render the testimony of that witness admissible." *Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 473, 337 P.3d 627, 632 (2014). Trial courts have "broad discretion in the admission of evidence at trial, and [their] decision to admit such evidence will be reversed only when there has been a clear abuse of that discretion." *Karlson v. Harris*, 140 Idaho 561, 564, 97 P.3d 428, 431 (2004) (quoting *Empire Lumber Co. v. Thermal–Dynamic Towers, Inc.*, 132 Idaho 295, 304, 971 P.2d 1119, 1128 (1998)).

When reviewing the record for an alleged abuse of discretion, this Court must determine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863 421 P.3d 187, 194 (2018). Finally, this Court "reviews the trial

6

court's relevancy decisions under the de novo standard of review." *Mac Tools, Inc. v. Griffin*, 126 Idaho 193, 199, 879 P.2d 1126, 1132 (1994) (citations omitted).

## IV. ANALYSIS

### A. The district court did not abuse its discretion by denying Appellants' motion for a mental examination of Joan.

Appellants challenge the district court's December 2018 ruling denying their motion to compel Joan to undergo a mental examination. Appellants moved for a physical and mental examination of Joan to assist in establishing she was susceptible to undue influence. Dr. Camille LaCroix, Appellants' medical expert, testified that an in-person neuropsychological and forensic psychiatric evaluation was the only way to opine with medical certainty as to Joan's vulnerability to undue influence. Appellants also argue that the district court conceded Joan's mental capacity was in controversy; thus, good cause existed to order the exam. Appellants' argument misconstrues the district court's findings.

In denying the motion, the district court did note that Joan's mental screen test (MoCA) results from March 16, 2018 showed a mild cognitive impairment, which could place Joan's susceptibility to undue influence in controversy. However, the district court went on to conclude that "it is more likely than not, that she possessed the requisite testamentary capacity during the period of May–August 2017. Therefore, it does not appear that Joan's testamentary capacity is 'in controversy.'" In addition, the district court also found that Appellants had failed to establish that good cause existed to conduct the examination.

Under Idaho Rule of Civil Procedure 35(a), "[t]he court *may* order a party to submit to mental or physical examination when the mental or physical condition of the party is in controversy." *Navarro v. Yonkers*, 144 Idaho 882, 887, 173 P.3d 1141, 1146 (2007) (emphasis in original). Thus, the decision to order psychological testing is within the discretion of the trial court. *Id*. Moreover, as we discussed in *Hammer v. Ribi*, 162 Idaho 570, 575, 401 P.3d 148, 153 (2017), the Idaho rule is nearly identical to Federal Rule of Civil Procedure 35(a), and in that event "[w]e prefer to interpret the Idaho Rules of Civil Procedure in conformance with interpretations of the same language in the federal rules." *Id*. (quoting *Westby v. Schaefer*, 157 Idaho 616, 622, 338 P.3d 1220, 1226 (2014)). Thus, we look not only to Idaho authority, but also to cases interpreting the federal rule to establish the legal standards applicable to the specific choices available to the district court. *Lunneborg*, 163 Idaho at 863 421 P.3d at 194.

7

When the U.S. Supreme Court examined the "good cause" and "in controversy" elements under Federal Rule 35(a), the Court explained that these standards

> are not merely met by conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination.

*Schlagenhauf v. Holder*, 379 U.S. 104, 120–21 (1964). The Court warned, however, that the rule "requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of 'in controversy' and 'good cause.'" *Id.* at 118–19.

The district court determined that Appellants did not show good cause to support a Rule 35 examination because: (1) an examination would be intrusive; (2) other avenues existed to obtain the information; and (3) Appellants' expert, Dr. LaCroix, already formulated her opinions from the information provided to her. The district court also noted Appellants had not "conducted any depositions of those persons who may have relevant information and data concerning the circumstances leading up to Joan['s] decisions. . . . The relevant information and data necessary to establish or disprove a claim of undue influence can adequately be obtained through the depositions of parties. . . ."

Appellants advance three arguments to support their assertion that good cause existed to order a Rule 35 examination. First, Appellants argue that there was no meaningful alternative way to obtain the requested information. Second, Appellants contend that because they did not yet have the information, "a full forensic examination from [Dr.] LaCroix was the only way she could formally evaluate and opine" on the issue. Finally, Appellants assert that by denying the examination, the district court undercut their ability to rebut Respondents' evidence, which prevented Appellants from gathering the precise evidence Rule 35 was designed to elicit. Though these arguments are reasonable, they do not establish that the district court abused its discretion in denying Appellants' request for a Rule 35 examination.

The district court rejected Appellants' first argument that there was no alternative to obtain the requested information, pointing out that the information Appellants sought "could easily be obtained from the parties, including Joan as well as her attorney, accountant and treating physicians through deposition." The district court's conclusion was reasonable and within the

"outer boundaries of its discretion," *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194, in evaluating the nature of Appellants' request. Despite the district court's intimation that depositions or additional evidence might establish good cause, Appellants never pursued depositions in this case.

Appellants second argument is also without merit. The district court considered evidence submitted by Appellants in the form of published articles by two doctors, Dr. Kenneth I. Shulman and Dr. Thomas G. Gutheil. The court found that the articles did not "suggest, recommend or describe what further testing for cognition . . . should be performed if the cognitive screening device detects some degree of impairment." The court also cited an article by Dr. Gutheil to establish that as to "the issue of capacity (testamentary or otherwise) Joan is entitled to a presumption of competence." (citing Thomas G. Gutheil, *Common Pitfalls in the Evaluation of Testamentary* Capacity, 35(4) JOURNAL OF THE AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW 514–517 (Dec. 2007), at 515. The district court also considered the testimony of Dr. LaCroix, "who has expertise in both prospective and retrospective assessment of testamentary capacity and vulnerability to undue influence." Dr. LaCroix had reviewed all of Joan's medical records as well as the medical records and reports from Dr. Lohmann, Dr. Ruske, and Dr. Vegwert, who had recently examined Joan.[2] These experts each opined that Joan could manage and care for herself and her financial affairs.

As the district court recognized, Appellants did not explain why Dr. LaCroix could not perform a retroactive assessment of Joan, which her qualifications suggested she was capable of doing, without requiring that Joan undergo a third mental examination. The district court noted an examination would be strenuous, requiring Joan to travel to Boise, Idaho for 6-8 hours of additional testing and interviews. Thus, the district court, after considering Appellants' expert evidence along with that of other medical providers, properly exercised reason in reaching its discretionary decision to deny Appellant's motion.

As to Appellant's final argument, we disagree with the contention that the district court limited Appellant's ability to prove undue influence by denying the Rule 35 motion. The district court concluded that the information Appellants sought through a Rule 35 examination could be

---

[2] Dr. Lohmann had been the longtime care provider for Jack H. and Joan. Dr. Nicole Ruske was the successor care provider to Dr. Lohmann. Jack H. and Joan were also court ordered to each undergo a medical examination by Dr. Ruske in the guardianship case. Dr. Shelley Vegwert was the court appointed visitor and was court ordered to conduct interviews of Jack H. and Joan as well as Jack S. and Janice.

obtained through other, less intrusive means, such as depositions of Fitzgerald, Dr. Lohmann, Dr. Ruske, or Dr. Vegwert—none of which were pursued. Although Appellants argued that a mental examination of Joan was more economical and efficient than taking depositions, the district court appropriately weighed its options and concluded that the intrusive nature of the exam is a greater concern than economic factors when the court is considering the privacy rights of someone compelled to participate in such an examination. Thus, we hold the district court did not abuse its discretion in finding there was not good cause to order that Joan undergo a Rule 35 examination.

**B.** **The district court did not abuse its discretion by dismissing Count Three, which sought a declaratory judgment as to Jack H.'s testamentary capacity.**

Appellants challenge several portions of the district court's decision on Count Three. While we will address each argument individually, broadly speaking, Appellants argue that the district court erred in dismissing Count Three, which sought a declaratory judgment that Jack H. (1) lacked "donative" capacity to make lifetime gifts to Jonathan, and (2) lacked testamentary capacity to execute the revised will. For the reasons discussed below, we affirm the district court's decision.

*a. Whether there is a genuine dispute of material fact as to Jack H.'s testamentary capacity.*

The core of the issue surrounding Count Three centers on the legal standard for evaluating testamentary capacity. The parties take opposing positions on the difference between the legal standard for testamentary capacity and the medical standard for dementia—and whether there is a difference sufficient to raise a genuine issue of material fact.

Appellants challenge the district court's conclusion that Fitzgerald's testimony was "the only complete assessment in the record of Joan['s] and Jack H. Nelsen's testamentary capacity at the time of the execution of the wills[.]" Appellants argue that expert testimony supports their contention that Jack H. suffered from dementia when he changed his will and made the inter vivos gift, which is more than adequate to raise a genuine dispute of material fact.

This Court has not identified donative capacity as a standard separate from testamentary capacity. The district court characterized the standards for both capacities as the same and conducted its analysis using the term "testamentary capacity." We will do the same.

"Generally the question of the mental capacity of a decedent is a question of fact." *In re Goan's Estate*, 83 Idaho 568, 573, 366 P.2d 831, 834 (1961). That said, the contestant of a will has the burden of establishing a lack of testamentary capacity. I.C. § 15-3-407. Thus, "[w]here the non-moving party will bear the burden of proof at trial, the moving party's burden may be satisfied

10

by showing the absence of material fact with regard to any essential element of the non-moving party's claim." *Fisk v. McDonald*, 167 Idaho 870, 889, 477 P.3d 924, 943 (2020) (quotation omitted). In addition to testamentary capacity, to effectuate a gift, the donor must also manifest an intent to make a gift of the property to the donee. *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 126, 206 P.3d 481, 490 (2009).

This is the essence of the parties' dispute over testamentary capacity—whether the facts submitted by Appellants were enough to establish a material dispute as to the elements of that claim.

To have testamentary capacity, the

Testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, [1] the nature and extent of the property of which he is about to dispose, [2] and the nature of the act which he is about to perform, [3] and the names and identity of the persons who are to be the objects of his bounty, and [4] his relation towards them.

*Goan's Estate*, 83 Idaho at 573, 366 P.2d at 834. The presence of dementia does not always equate to a lack of testamentary capacity. "[A]ge, physical infirmity, pain and suffering, or even partial mental debility, in themselves or all concurring, are not necessarily sufficient to support a finding of mental incapacity." *In re Heazle's Estate*, 74 Idaho 72, 75–76, 257 P.2d 556, 557–58 (1953). Indeed, a person may be unable to transact business, but may nonetheless be competent to make a will. *Id.* at 76, 257 P.2d at 558. Other jurisdictions have likewise concluded the mere presence of dementia on its own is insufficient to raise a genuine issue of material fact about testamentary capacity. *See, e.g.*, *In re Estate of McLean*, 99 P.3d 999, 1003–04 (Wyo. 2004) (noting evidence of the testator's declining mental and physical health before the will was executed, or during the years later, is irrelevant, as the testator must only possess testamentary capacity when the will is executed); *Neumeyer v. Estate of Penick*, 906 N.E.2d 1168, 1173 (Ohio Ct. App. 2009) (noting evidence the decedent suffered from dementia on the day the will was executed, standing alone, cannot create a genuine issue of material fact as to a lack of testamentary capacity without some evidence that the disease rendered the decedent incapable of knowing her family or her estate or understanding the effect of her actions).

Appellants contend the district court erred under this Court's holding in *Heazle's Estate* because Dr. Lohmann independently conducted a competency examination of Jack H. and Joan on November 18, 2017, and determined Jack had dementia and was incompetent to make legal and

11

financial decisions. This examination took place within three months of the August 2017 special meeting. As a result, Appellants suggest that under our decision in *Heazle's Estate*, Jack H.'s personal physician's findings here are more than adequate to create a dispute of fact.

The issue in *Heazle's Estate* was whether there was sufficient evidence from testimony of the testator's physician to support a finding of incompetency when the testator executed a second will during her hospitalization. 74 Idaho at 75, 257 P.2d at 557. The attending physician knew the testator, Ms. Heazle, for years, examined her on October 4, admitted her to the hospital for observation on October 21 and 22, and was the attending physician from the time she was readmitted on October 30 until she died on November 3. *Id.* at 79, 257 P.2d at 560. According to the physician's testimony, the testator was not competent on October 30 when the subsequent will was executed. *Id.* This Court held the physician's testimony was substantial evidence to support a finding that the testator lacked testamentary capacity. *Id.*

The facts here are distinguishable from *Heazle's Estate*. Dr. Lohmann did not evaluate Jack H. "at the time of making his will," as was the case in *Heazle's Estate*. To the contrary, Dr. Lohmann evaluated Jack H. three months after the August 2017 special meeting and more than two years after Jack H. first changed his will. We have noted that a three-month delay is too remote from signing a will to be probative. *See In re Estate of Conway*, 152 Idaho 933,942, 277 P.3d 380, 389 (2012) (citing *King v. MacDonald*, 90 Idaho 272, 278–79, 410 P.2d 969, 972 (1965)).

Nevertheless, we recognize that declarations not proximate to the time of the execution of the will, *including those made both before and after*, may be admitted to establish testamentary capacity, but only when they are not too remote to throw light upon the mental condition of the testator at the time of the execution of the relevant documents. Whether that evidence should be admitted presents a discretionary decision for the trial court. Thus, the district court here had the discretion to determine whether Dr. Lohmann's statements, made more than three months after the special meeting in August 2017, were too remote to be probative.[3] The district court did not abuse its discretion in making this decision. *See Green v. Green*, 161 Idaho 675, 679, 389 P.3d 961, 965 (2017) (explaining the decision to admit testimony is a discretionary decision); *Lunneborg v. My Fun Life*, 163 Idaho 856, 866, 421 P.3d 187, 197 (2018) (explaining that the factfinder has discretion to assign weight to conflicting evidence).

---

[3] Appellants contest the district court's evidentiary rulings on the facts they submitted here. Those arguments are reviewed below.

Both the admissibility and the weight to afford the testimony if it is admitted are discretionary decisions for the district judge. Thus, even if admitted, the district court has discretion to give the evidence the weight it deems appropriate.

Although Appellants assert that doctors Lohmann and Ruske offered direct expert opinions on Jack H.'s testamentary capacity, the facts in the record suggest otherwise. Specifically, Dr. Ruske, in March 2018, opined that Jack H. was suffering from "advanced dementia" and was "unable to complete full orienting questions…unable to reasonably make financial, social, or business decisions…incompetent in these affairs, consistent with previous designation." Dr. Lohmann's findings were based on the "previous designation" referenced by Dr. Ruske. Dr. Lohmann found that Jack H. had dementia, and opined he was incompetent to make legal and financial decisions. Dr. Vegwert corroborated these same findings, stating, "Jack Sr. struggles with dementia and is in need of care in all areas of his functioning."

Neither Dr. Lohmann, Dr. Ruske, nor Dr. Vegwert offered opinions concerning Jack H.'s testamentary capacity at or near the time he executed his new will or the donative documents. As noted above, evidence of a lack of testamentary capacity requires more than just a mistimed diagnosis of dementia or noting that one is generally unable to make financial, social or business decisions. Thus, even if Jack H. suffered from some *unspecified* degree of dementia on the dates he executed his will and the inter vivos gifting document in 2015 and 2017, that "fact is insufficient, standing alone, to raise a genuine issue of material fact without some evidence to suggest that the dementia rendered him incapable of knowing his family [and his relation toward them], the nature of his estate, or the effect his will would have on his family and his estate." *Conway*, 152 Idaho at 940, 277 P.3d at 939.

Appellants criticize the district court for taking a "*Celotex*-like"[4] approach to scrutinizing the summary judgment here. But the district court applied the appropriate summary judgment standard from cases like *Fisk*, cited above, to find that it was only Fitzgerald who gave any direct testimony of Jack H.'s testamentary capacity during the relevant times when Jack H. was making estate planning decisions. Fitzgerald specifically noted that Jack H. consistently, and without assistance, prompt or aid, identified his children, his assets and the associated history of those

---

[4] The reference is to *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). *See also Fisk*, 167 Idaho at 889-90, 477 P.3d at 943-44 in which this Court cited *Celotex* for the appropriate standard for cases like this one, where the non-moving party will bear the burden of proof at trial.

assets, including the history of the family's dairy and farming business and the membership interests in Nelsen Farms, LLC. This testimony is unrebutted by Appellants.

Appellants fail to acknowledge the distinction the district court drew between the evidence Appellants submitted and what was at issue in the case: testamentary capacity at the time the relevant documents were executed. Appellants' evidence focused on Jack H's dementia rather than his testamentary capacity. Without evidence from Appellants to contest Fitzgerald's direct testimony concerning Jack H.'s testamentary capacity on the days Jack H. changed his will and executed relevant documents, the district court correctly found that Fitzgerald's testimony was the "only actual evidence in the record of Jack H. and Joan Nelsen's testamentary capacity at the time of the execution of the wills or their capacity at the time of the gifting of shares" in the LLC:

> The uncontroverted statement of Mr. Fitzgerald that '[b]oth Joan [] and Jack H. consistently, and without assistance, prompt or aid, identified their children, their assets and the associated history of those assets, including the history of the family's dairy and farming business and the membership interests in Nelsen Farms, LLC,' support the court's finding that Plaintiffs have failed to create a genuine issue of material fact as to the issue of testamentary capacity at the time of the execution of the wills in 2015, or donative capacity at the time of the Special Meeting on August 4, 2017.

The district court reached this decision after reviewing the entire record. This included testimony from Fitzgerald's declaration, as noted above, recounting the private meetings he had with Jack H. and Joan on May 20, 2015, May 22, 2015, June 16, 2015, and November 3, 2015, during which Jack H. and Joan discussed modifying their estate plans and executed multiple new wills. Fitzgerald also met with Jack H. and Joan on May 8, 2017, May 30, 2017, August 4, 2017, and August 21, 2017, to discuss their decision to make inter vivos gifts of their interests in the LLC to Jonathan rather than passing those interests to him under the wills they executed in 2015. As to each occasion, Fitzgerald testified to evaluating Jack H. and Joan's respective legal capacity and competency and determined they were competent to make and execute new wills and the inter vivos transfers. In contrast, Appellants provided no evidence to create a genuine issue of material fact as to Jack H.'s testamentary capacity to execute these documents at the time they were executed. For these reasons, we hold the district court did not err in dismissing Appellants' claim for declaratory judgment as to Jack H.'s testamentary capacity.

14

*b. Whether the district court (1) erroneously disregarded evidence as remote (2) applied the proper evidentiary standard of remoteness or (3) improperly weighed evidence.*

Dovetailed with the analysis immediately above, Appellants contest the district court's rulings on the evidence Appellants submitted to establish Jack H.'s lack of testamentary capacity. Appellants claim the district court erred in two ways: first, by applying an improper evidentiary standard regarding the remoteness of much of the evidence submitted by Appellants; and second, by improperly weighing evidence at the summary judgment stage of the case. Each topic is subdivided into multiple arguments that we will discuss in turn.

Appellants assign three errors regarding the remoteness of evidence and the evidentiary standards the district court applied. First, Appellants argue the district court erroneously disregarded as remote most of the evidence that Appellants submitted. Second, Appellants maintain that even under the court's narrow view on remoteness, they established a disputed issue of fact about testamentary capacity with Jack S.'s notes taken after the August 2017 meeting. Third, Appellants suggest the district court improperly weighed evidence at the summary judgment stage.

As we recognized above, "[t]he law is settled that physical and mental condition of decedents as bearing on their testamentary capacity both before and after the actual time of the execution of the will is admissible when not too remote[.]" *In re Estate of Brown*, 52 Idaho 286, 286, 15 P.2d 604, 607–08 (1932). That said, remoteness bears "on the weight rather than the admissibility" of the evidence. *Id.*

"The determination of the question whether evidence is or is not too remote is for the determination of the trial court and it is clothed with wide discretion in this regard." *State v. Perez*, 99 Idaho 181, 183, 579 P.2d 127, 129 (1978) (internal citations omitted). "As evidence goes back further in time—that is, becomes [more] remote—it is entitled to decreasing weight. At some point it becomes so remote that it no longer tends to make a fact 'of consequence . . . more probable or less probable' and, therefore, is inadmissible because it is not relevant under Idaho Rule of Evidence 401." *Lehmkuhl v. Bolland*, 114 Idaho 503, 510, 757 P.2d 1222, 1229 (Ct. App. 1988). *See In re Goan's Estate*, 83 Idaho at 574, 366 P.2d at 835.

Appellants argue that the district court erroneously rejected much of Appellants' evidence as too remote, including various statements from Janice concerning events that occurred between 1992 and 2009, and statements from Matthew about matters between 2008 and 2010. Still, when

15

the matter before the court will ultimately be tried as a non-jury trial, the trial court may make appropriate inferences of uncontested facts. *Riverside Dev. Co. v. Ritchie,* 103 Idaho 515, 519, 650 P.2d 657, 661 (1982). Thus, the district court here had the discretion to determine whether Appellants' proffered evidence was too remote in time to "throw light upon the mental condition of the testator at the time of the execution of the will." *King v. MacDonald*, 90 Idaho 272, 279, 410 P.2d 969, 972 (1965).

As the district court recognized, the testimony from Janice and Matthew concerned events that occurred years before Jack H. signed the new will and inter vivos documents and was thus "wholly unrelated to Joan['s] and Jack H.['s] mental state during the relevant time frame of 2015 and 2017." As we noted above as to the expert testimony from the three doctors who treated Jack H., such testimony offers little relevance, and is thus entitled to little weight concerning Jack H's testamentary capacity at the time he signed the documents leading to this lawsuit. Based on this broad, deferential standard, we hold the district court did not abuse its discretion in excluding Janice and Matthew's statements as too remote in time to be probative to the issues of the case. *See Burgess v. Salmon River Canal Co., Ltd.*, 127 Idaho 565, 575, 903 P.2d 730, 740 (1995) (holding evidence could properly be excluded as irrelevant under I.R.E. 401 as too remote in time).

Appellants next argue that even if this Court determines the district court did not err in assessing remoteness, Appellants still put forth sufficient evidence to create a genuine issue of material fact concerning Jack H.'s testamentary capacity at the time of the 2017 conveyance. In support, Appellants point to the notes from Jack S. taken after the meeting on August 4, 2017. Jack S.'s notes stated, in part, that the only reason Jack H. offered for making the disputed conveyance was that Jack S. had not visited in a month. Appellants also suggest the opinions from doctors Lohmann, Ruske, and Vegwert raised a genuine dispute of material fact concerning testamentary capacity.

Like the other evidence Appellants submitted, Jack S.'s self-titled "Documentation of Disinheritance Meeting" does not address Jack H.'s testamentary capacity at the time of the execution of the will or his capacity at the time of gifting of the shares. Appellants had ample opportunity to depose Fitzgerald, who was present at multiple meetings with Jack H. and Joan both before and when the conveyances were made. They failed to do so. Appellants also could have presented evidence, if it existed, that Jack S. had personal knowledge that his father lacked testamentary capacity. This could have been accomplished by introducing evidence establishing

16

that Jack H.'s dementia rendered him "incapable of knowing his family [and his relation towards them], the nature of his estate, or the effect his will would have on his family and his estate." *Conway*, 152 Idaho at 940, 277 P.3d at 939. Such evidence is nowhere in the record and Jack S.'s notes, without more, are insufficient to create a genuine dispute of material fact.

While the Jack S. notes failed to address testamentary capacity *at the time* of the execution of the will, the opinions from doctors Lohmann, Ruske, and Vegwert failed to address testamentary capacity at all. As with other evidence Appellants submitted, the medical opinions in the record address only the fact that Jack H. generally suffered from some degree of dementia. That, standing alone, cannot raise a genuine dispute of material fact as to testamentary capacity. *See id.* (noting the fact that testator was "obviously suffering from some dementia" was not sufficient to undermine testamentary capacity, particularly when the testator's will was prepared with assistance of counsel who was independent and disinterested). Accordingly, the district court did not abuse its discretion in making this determination.

Finally, Appellants claim that the district court improperly weighed evidence at the summary judgment stage. This argument aligns with Appellants' arguments about the district court's handling of the remoteness question, as observed above. We again note that "[g]enerally, the trial court is not permitted to weigh the evidence or resolve controverted factual issues when ruling on a motion for summary judgment." *AID Ins. Co. v. Armstrong*, 119 Idaho 897, 900, 811 P.2d 507, 510 (Ct. App. 1991). Therefore, this Court has held that even when there are no genuine issues of material fact between the parties "[a] motion for summary judgment must be denied if the evidence is such that conflicting inferences can be drawn therefrom and if reasonable [jurors] might reach different conclusions." *Riverside Dev. Co. v. Ritchie*, 103 Idaho at 519, 650 P.2d at 661 (citing *Lundy v. Hazen*, 90 Idaho 323, 326, 411 P.2d 768, 770 (1966)). Such a rule is proper where the matter is to be tried to a jury, because even though evidentiary facts may be undisputed, those evidentiary facts may yield conflicting inferences as to what the ultimate facts of a case are. If such conflicting inferences are possible, then summary judgment should not be granted as it would deprive the parties of the right to have the jury weigh the conflicting facts and make the decision.

However, where the facts are not disputed and the trial court, rather than a jury, will be the trier of fact, summary judgment is appropriate, despite the possibility of conflicting inferences because the court alone will have to resolve the conflict between those inferences. This is precisely

17

that case. The facts established by Jack S., Janice and Matthew were not disputed—but they were insufficient—due to their remoteness and/or failure to address testamentary capacity. Thus, they failed to create a genuine issue of material fact. The reasoning behind this rule is founded in judicial economy: there would be no use in having the trial court deny the summary judgment while making no inferences about the sufficiency of evidence at the summary judgment stage, just to perform the same evaluation of the undisputed evidence during a trial and reject it. The rationale cited by this Court in *Riverside* supports the district court's actions in this case:

> It was for the court below, as the trier of fact, to determine whether the evidence supported the inferences necessary to support a finding of [testamentary capacity]. That is exactly what the district court did in determining that [issue]. To reverse and remand this case to the district court, ordering it to do in another proceeding what it has already done, *i.e.,* draw the appropriate inferences from the undisputed evidentiary facts, would be an extreme waste of judicial resources and an utterly useless act.

*Id*. at 520 n.2, 650 P.2d at 662 n.2.

We recognize that the district court twice referred to Respondents' evidence as "outweighing" Appellants' evidence. This first occurred when the court referenced Fitzgerald's accounting of Jack H. and Joan's mental state as it related to Joan's susceptibility to undue influence. The district court explained: "The [c]ourt also finds Mr. Fitzgerald's accounting of Joan and Jack H. Nelsen's mental state before each will was executed and his record of what communications were related to him as their attorney before the inter vivos gifts substantially outweighs the slight evidence Plaintiffs have presented." The second instance occurred when the district court described Fitzgerald's testimony as "substantially outweigh[ing] the scant evidence provided by the Plaintiffs" as to testamentary capacity under Count Three. Appellants are correct that it is not the role of the district court judge to weigh evidence at summary judgment when the case will be tried to a jury, or when the facts are controverted and credibility determinations must be made by the fact finder. However, where, as here, the district court is the trier of fact, the court is not constrained to draw inferences in favor of the party resisting summary judgment as to uncontested facts. *See id*. at 519, 650 P.2d at 661. This is so even if there is a possibility of conflicting inferences because the district court alone resolves such a conflict. *Id*.

While we caution trial courts to refrain from weighing evidence on summary judgment in jury cases, we are not convinced the district court improperly *weighed* conflicting evidence here. The district court acknowledged the proper standard for an action tried before the court without a

18

jury and made reasonable inferences based on that evidence. "When an action will be tried before a court without a jury, the court may, in ruling on the motions for summary judgment, draw probable inferences arising from the undisputed evidentiary facts." *Losee v. Idaho Co.*, 148 Idaho 219, 222, 220 P.3d 575, 578 (2009). "Drawing probable inferences under such circumstances is permissible because the court, as the trier of fact, would be responsible for resolving conflicting inferences at trial." *Id.* (quoting *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 124, 206 P.3d 481, 488 (2009)).

Thus, we conclude the district court did not err.

> c. *Whether the district court erred in allowing broad, general objections to the proffered evidence and by improperly identifying the scope of inadmissible evidence.*

Appellants argue the district court abused its discretion by: (1) allowing Respondents to object to evidence without specifying why each piece of evidence offered was objectionable and (2) failing to identify the scope of Appellants' evidence that the court did not consider. Appellants maintain the district court opted only to provide limited examples of objectionable testimony as the basis of its disregarding "the vast majority" of Appellants' evidence. Appellants also maintain the district court allowed Respondents to get away with generalized objections. Based on the record before us, we conclude the district court did not err.

We have stated, "[f]or an objection to be preserved for appellate review, either the specific ground for the objection must be clearly stated, or the basis of the objection must be apparent from the context." *Ballard v. Kerr*, 160 Idaho 674, 691–92, 378 P.3d 464, 481–82 (2016) (quoting *Hansen v. Roberts*, 154 Idaho 469, 473, 299 P.3d 781, 785 (2013)). An objection that an opinion lacks foundation, for example, is not enough to preserve the argument on appeal that testimony should be excluded as unreliable or speculative. *See id.* at 692, 378 P.3d at 482.

Appellants point to *Hansen v. Roberts*, 154 Idaho 469, 299 P.3d 781 (2013), to support the proposition that the district court erred by allowing Respondents to make generalized objections. In *Hansen*, this Court held that objections to expert testimony were not preserved for appeal when the attorney merely objected to "all of" the testimony as invading the province of the jury but failed to explain why the testimony was inadmissible or provide context for the court to determine the validity of the objection. *Id.* at 474, 299 P.3d at 786.

Below, Respondents objected to the declarations of Jack S. and Janice Lehman. First, as to the Jack S. declaration, Respondents identified paragraphs 4–7 and 10–16 as objectionable, and

argued the information lacked relevancy as to Jack H. and Joan's mental condition or susceptibility to undue influence, was too remote in time, and contained hearsay statements spanning 37 years. In his declaration, Jack S. described a range of events dating back to 1978 when he was in college. He testified about the Nelsen Dairy, which operated as the family's farming operation prior to 2002, and the merging of Nelsen Dairy with Nelsen Brothers Partnership to create Nelsen Farms, LLC. The district court properly concluded this testimony was irrelevant to Jack H. and Joan's mental capacity. Respondents also specifically objected to paragraphs 17–18 and 19–22 on the grounds that the statements in Jack S.'s declaration lacked foundation, were speculative, irrelevant, and contained hearsay. The objectionable testimony here concerned Jonathan's ex-wife, and speculative statements that Jack H. was not mentally competent, and that Joan seemed confused. As a result, we cannot find that Respondents' objections fail for lack of particularity.

Second, Respondents also specifically objected to paragraphs 4–12 of Janice Lehman's declaration and her deposition testimony on the grounds it: (1) contained statements that were too remote in time to help clarify Jack H.'s and Joan's mental condition in 2015 and 2017, (2) contained hearsay, (3) lacked factual foundation, and (4) contained conclusory, speculative, and irrelevant statements. In her declaration, Janice discussed a visit from 2004 during which Jack H. got lost while driving and her recollection of purchasing a cell phone for him. She also testified that Jonathan worked for Jack H. and Joan until 2004 and recalled a dating relationship she had with someone while attending college.

Appellants cite *Hansen* to show that "broad, general objection…is not a proper objection to preserve" a challenge on appeal. *Id.* at 474, 299 P.3d at 786. However, the issue on appeal here is not whether the objection has been *preserved for appeal*; rather, we are asked to decide whether broad, general objections are a sufficient basis to *exclude evidence*. In any event, *Hansen* does not support Appellants' interpretation that each individual statement in a declaration must be objected to; it stands for what we have explained: The specific ground for the objection must be clearly stated. We conclude that it was. As a result, the district court did not abuse its discretion by allowing Respondents' objections to the Jack S. and Janice Lehman declarations and addressing those objections accordingly.

Turning to the district court's evaluation of the testimony, Appellants contend the district court abused its discretion by failing to identify the scope of evidence it excluded. A lower court abuses its discretion when it does not provide sufficient reasoning and analysis for this Court to

20

review. *See, e.g.*, *Schultz v. Schultz*, 145 Idaho 859, 863, 187 P.3d 1234, 1238 (2008) ("Such a lack of elaboration is considered an abuse of discretion because this Court cannot review the order to determine whether the lower court acted consistently with applicable legal standards."). In support of this argument, Appellants rely on a footnote in *Davis v. Tuma*, 167 Idaho 267, n.2, 469 P.3d 595, n.2 (2020). In that footnote, this Court admonished that "[w]e have repeatedly stated that such a failure to make threshold evidentiary decisions before deciding a summary judgment motion is an abuse of discretion, one ordinarily requiring remand for appropriate findings." *Id.* Here, because the district court did not identify each piece of evidence that was objectionable, Appellants suggest they are left to guess what portions of the evidence the court excluded and the basis for that exclusion.

In *Tuma*, we held that the district court abused its discretion because it failed to "articulate the relevant legal standard," and "provided [only] one sentence for its reasoning." *Id.* at 279, 469 P.3d at 607. Here, the district court entered a 29-page decision, 18 pages of which contained the court's legal standards and reasoning. These are not analogous cases. In particular, the district court thoroughly examined the Jack S. declaration and provided sound reasoning for why it was (1) inadmissible and (2) failed to create a genuine issue of material fact, explaining:

> Previously, the Nelsen children believed that Jonathan and Jack S. Nelsen were both going to equally share the farm when their parents died. Jack S. Nelsen states that he worked without pay and donated his and Emily Nelsen's tax returns and PERSI benefits to the family farm before he started receiving a salary in 1981. Given this history and Jack S. Nelsen's stated belief that he had a 'right' to an inheritance of the family farm, the [c]ourt understands why Plaintiffs believe that his [sic] parents were acting unnaturally, unjustly or irrationally when they gifted their shares to Jonathan Nelsen. This belief, however, does not prove the actions of Joan and Jack S. [sic] to be the result of undue influence.

The district court also explained:

> Much of the evidence Plaintiffs provided for the court's consideration is wholly unrelated to Joan and Jack H. Nelsen's mental state during the relevant time frame of 2015 and 2017. Additionally, much of the testimony pointed to by Plaintiffs in deposition testimony and declarations on this issue concerns physical effects of old age and mental decline common to elderly individuals. The evidence also contains many speculative and conclusory opinions without factual foundation. Here, [Respondents] did not move to strike portions of [Appellants'] evidence on summary judgment.

21

Much like it found regarding Jack S.'s declaration, the district court ultimately concluded Janice's testimony was not relevant to the issues in the case. In excluding her declaration, the district court explained:

> Janice states that her brother Jonathan increasingly isolated their parents from other family members and that her mother has become 'extremely susceptible to suggestions, innuendos and influence exerted by my brother Jonathan.' There is scant evidence to support these conclusory statements. Additionally much of what she stated is too remote to be considered. Janice asserts that Jack H. Nelsen displayed difficulties with personal hygiene while visiting her home in Arizona in 1992. Next Janice stated that by 2004 her father would become lost and could not find his way to her home when visiting her in another state. Finally, in either November of 2008 o[r] November 2009, Janice remembers Jack H. Nelsen having trouble recalling current events on the farm and would repeatedly tell the same stories. While these statements may support evidence of Jack H. Nelsen's decline with age, they do not show that Jack H. was 'extremely susceptible to suggestions, innuendos and influence'–as suggested by the Plaintiffs–nor do they show that Jack H. was readily subject to the improper influence of others. . . . Even if the [c]ourt accepted Janice's conclusory and speculative statements, Janice Lehman has provided the [c]ourt with observation[s] spanning a twenty-year period that are far too removed from when Joan and Jack H. Nelsen revised their estate plan.

As with the district court's decision to exclude the Jack S. declaration, its explanation for excluding Janice's declaration was based on sound reasoning explaining why Janice's testimony was inadmissible. Unlike the facts at issue in *Tuma*, the district court's decision here clearly identified what evidence was excluded and the reasoning why such evidence was inadmissible. We hold the district court properly identified the scope of Appellants' evidence that it excluded and did not abuse its discretion.

>    d.   *Whether the district court improperly disregarded lay opinions.*

Appellants argue the district court's reasoning for disregarding the lay opinions of Jack H.'s family was incorrect and an abuse of discretion. Appellants maintain the district court incorrectly disregarded testimony from four of Appellants' witnesses: (1) Janice, (2) Jack S., (3) Emily, and (4) Matthew. Respondents claim the district court properly determined Appellants' testimony was inadmissible because the testimony was speculative, lacked foundation, constituted hearsay, was too remote in time, or failed to establish a genuine issue of material fact. Respondents also point out that the district court did not exclude Appellants' testimony because Appellants were unqualified.

22

The decision to admit opinion testimony of lay persons is subject to the abuse of discretion standard. *Kolln v. Saint Luke's Reg'l Med. Ctr.*, 130 Idaho 323, 328, 940 P.2d 1142, 1147 (1997). Under Idaho law, both lay and expert opinion testimony on the competency of a person to make a will is admissible. *Heazle's Estate*, 74 Idaho at 76, 257 P.2d at 558. As to the admissibility of lay opinion testimony, Idaho Rule of Evidence 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion or inference is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

I.R.E. 701.

First, Appellants contest the district court's decision to exclude Janice's declaration even though her testimony contained "personal story after personal story" to bolster her personal knowledge. In her declaration, Janice provided testimony that her father had, in her view, "become legally incompetent" when her parents visited her in 2008 or 2009 because Jack H. could not use a cell phone, had significant memory loss, and could not carry on a normal conversation. Janice also raised several instances between 1993 and 2009 to demonstrate that Jack H. was susceptible to innuendo and influence.

As we noted above, the district court determined Janice's testimony was too remote and conclusory for the court to consider. The district court explained, "[e]ven if the [c]ourt accepts Janice's conclusory and speculative statements, Janice Lehman has provided the [c]ourt with observations spanning a twenty-year period that are too far removed from when Joan and Jack H. Nelsen revised their estate plan." And, the court determined, there was "scant evidence to support" Janice's conclusory statements that Jonathan isolated their parents or that Joan was "'extremely susceptible to suggestions, innuendo and influence exerted by my brother Jonathan.'" We agree with the district court's evaluation and conclude Appellants have failed to show the district court abused its discretion in excluding Janice's testimony.

Second, Appellants argue Jack S.'s declaration was improperly excluded because his presence at the August 2017 meeting provided him adequate foundation and personal knowledge of Jack H.'s mental state at that time. In support, Appellants rely on this Court's decision in *Chamberlin v. George*, 63 Idaho 658, 658, 125 P.2d 307 (1942). In *Chamberlin*, this Court

23

determined that when a witness is acquainted with a person or has business dealings with that person, the witness may testify about "everyday observations." *Id.* at 658, 125 P.2d at 308.

Appellants contend that because Jack S. was at the meeting where Jack H. and Joan conveyed the bulk of their interest in the LLC and he asked questions of them at that time, he had adequate foundation to offer an opinion that Jack H. was not mentally competent and did not understand what he was doing. Appellants also contend that, if admitted, Jack S.'s statements would preclude summary judgment. We disagree.

As we have stated, mental and legal capacity are distinct concepts. We examined the distinction in depth in *In re Estate of Conway* when we explained that documents admitted in a guardianship/conservatorship proceeding contained inadmissible hearsay and were of "questionable relevance" to prove a lack of testamentary capacity. 152 Idaho at 943, 277 P.3d at 390. Testamentary capacity "is a question of fact to be determined upon the evidence in the individual case." *Id.* We have held before that "if a man is able to transact business, he is clearly competent to make a will, but he may be competent to make a will and still not be able to transact business." *Id.* at 76, 257 P.2d at 558 (quoting *Schwarz v. Taeger*, 44 Idaho 625, 630, 258 P. 1082, 1084 (1927)). Appellants provided the district court with no foundation to support the assertion that Jack H. did not know what he was doing other than that Jack H. stated his reasons for the change in the will was because Jack S. had not come to visit in a month. Even if Jack H. was wrong about the last time Jack S. visited, it does not establish that Jack H. lacked capacity to understand: (1) the nature and extent of the property he conveyed; (2) the nature of the act he performed; (3) Jonathan as the object of his bounty; or (4) Jonathan's relationship toward Jack H. *See In re Estate of Conway*, 152 Idaho at 943–44, 277 P.3d at 390–91. Thus, we find the district court did not abuse its discretion in excluding the Jack S. declaration.

Third, Appellants argue the district court incorrectly disregarded Emily's testimony on foundational grounds because Emily claimed she could not state whether Jack H. was competent. The district court correctly noted that Emily's testimony in her deposition was undermined when she conceded that she was "not in a position of saying whether someone isn't [competent]. I'm not a–that's not my gig in life." Emily was first asked whether Jack H. was competent, to which she replied: "No, I think that's probably been pretty well established." When asked if Joan was competent, she replied, "You know, this gets into a pretty fine gray area of when somebody is and when somebody isn't, and I'm not in the position of saying whether someone is or isn't." Based

24

on Emily's own testimony that she lacked personal knowledge, the district court did not abuse its discretion in excluding her testimony on those grounds.

Lastly, although Appellants assert the district court erred by excluding Matthew's deposition, Appellants provide no argument or case law in support of their position in this regard. "On appeal, the appellant carries the burden of showing that the district court committed error. Error will not be presumed but must be affirmatively shown on the record by appellant." *Am. Falls Reservoir Dist. No. 2 v. Idaho Dep't of Water Res.*, 143 Idaho 862, 882, 154 P.3d 433, 453 (2007). Thus, absent cogent argument in support, we hold the district court did not abuse its discretion in excluding Matthew's testimony.

> *e. Whether the district court improperly excluded expert testimony.*

Appellants argue the district court abused its discretion in disregarding Dr. LaCroix's testimony about both Jack H. and Joan. Appellants assert the district court improperly disregarded Dr. LaCroix's testimony addressing Jack H.'s competency when Respondents had expressly limited their objection to only Dr. LaCroix's opinions on Joan's competency. That said, Appellants allege that the district court's decision to exclude Dr. LaCroix's opinion on Joan was also erroneous because both Respondents and the district court failed to cite the evidentiary rules for excluding expert testimony. Appellants further contend the district court abused its discretion by failing to recognize its decision was a discretionary one.

"The admissibility of expert testimony is a matter committed to the discretion of the trial court and this Court will not overturn its ruling absent an abuse of that discretion." *J–U–B Engineers, Inc. v. Security Ins. Co. of Hartford*, 146 Idaho 311, 315, 193 P.3d 858, 862 (2008). Idaho Rule of Evidence 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." I.R.E. 702. This Court has held, "that it is incumbent upon an expert to set forth specific facts upon which an opinion is based." *J-U-B Engineers*, 146 Idaho at 316, 193 P.3d at 863.

Below, in support of Appellants' first Rule 35 motion, Dr. LaCroix wrote a letter dated May 10, 2018. In that letter, she explained:

> As you are aware, the Nelsens were recently examined by their primary care physician, Dr. Ruske, on 03/16/18. She concludes that Mr. Nelsen suffers from dementia, which my review of records supports. In fact, review of his records to

25

date support onset of significant cognitive impairment and physical debilitation requiring full assistance since at least 2013. Based upon his reported medical status and the significant medical evidence in the record, a psychiatric examination of Mr. Nelsen would not likely be possible. I do have enough information from the records to conclude that he has suffered cognitive impairment that includes the period of time in question in this estate matter and that he was not able to engage in financial or business matters in 2017.

Dr. LaCroix did not, however, opine on Jack H.'s testamentary capacity. Later, the district court denied Appellants' Rule 35 motion without prejudice, explaining its holding was based on Dr. LaCroix's conclusion that an examination of Jack H. was impossible and that she had enough information available to her to conclude he was not competent. Appellants then filed a supplemental motion for a Rule 35 examination. In that motion, Appellants sought only to examine Joan—not Jack H. In support of the supplemental motion, Dr. LaCroix confirmed, "[b]ased on my review of the medical records, it is my opinion…that an evaluation of Jack H. Nelsen is not indicated. . . ." As in her first letter, Dr. LaCroix did not opine on testamentary capacity, but she did determine Jack H. had advanced dementia and lacked capacity to make medical and financial decisions.

Now on appeal, Appellants contend the district court sua sponte disregarded Dr. Lacroix's testimony for purposes of summary judgment, and that it was unclear how her opinion lacked foundation for testamentary capacity in 2015 or 2017. Yet Dr. LaCroix had the opportunity to opine on whether Jack H. had testamentary capacity, or even to state whether she had sufficient information to make that assessment. But in the evidence before the district court (both letters), Dr. LaCroix did not mention testamentary capacity.

The district court disregarded Dr. Lacroix's testimony about Jack H. after concluding she "failed to explain how these facts relate to [Jack H.'s] testamentary capacity in 2015 and 2017." A person can have dementia and still possess testamentary capacity. Without an explanation from Dr. LaCroix as to how Jack H.'s level of dementia equated to a lack of capacity, we cannot conclude the district court's decision to exclude her testimony was an abuse of discretion. *See, e.g.*, *In re Estate of Conway*, 152 Idaho at 944, 277 P.3d at 391 ("the magistrate court's decision was supported by substantial and competent evidence that [testator] possessed testamentary capacity" when the will was executed despite a dementia diagnosis).

Turning to Dr. LaCroix's testimony about Joan, Appellants next argue that both the district court and Respondents failed to cite evidentiary rules or identify the correct legal standards for

26

expert testimony as Dr. LaCroix's testimony related to Joan. Appellants also maintain there was a solid basis for Dr. LaCroix's opinions, which the district court ignored.

An abuse of discretion will be found when the lower court does not perceive the issue as one of discretion. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194. Likewise, a lower court's failure to articulate and apply the relevant legal standard is an abuse of discretion. *See Crowley v. Critchfield*, 145 Idaho 509, 513, 181 P.3d 435, 439 (2007).

Here, the district court cited applicable case law and the legal propositions for admissibility of expert opinions from that case law when it excluded Dr. LaCroix's testimony. While we agree with Appellants that the district court did not directly cite the evidentiary rules, the case law and the standards the district court did cite referred to the evidentiary rules. Thus, the district court's reliance on those standards in a detailed, lengthy opinion was not an abuse of discretion. Respondents also cited applicable case law and evidentiary rules as providing the bases for excluding Dr. LaCroix's testimony. As a result, Appellants' contention fails.

Appellants' argument the district court ignored the basis for Dr. LaCroix's opinions is also inaccurate. The district court noted it had reviewed her opinions when Appellants moved for a Rule 35 examination. Moreover, the first district judge who presided over this case and who ruled on that proceeding warned Appellants that Dr. LaCroix's declaration needed buttressing. Some time later, the district court determined that no reinforcement of Dr. LaCroix's statement had been provided: "One year later, there is no evidence that any such [current] assessment was done." At summary judgment, the district court explained "the [c]ourt finds that Dr. LaCroix has provided the [c]ourt with conclusory opinions regarding Joan and Jack H. Nelsen's mental capacity in 2015 and 2017." Ultimately, the district court held Dr. LaCroix's "opinion to be without a sufficient basis to testify on this issue."

Given the analysis the district court undertook in deciding Dr. LaCroix's opinion was without sufficient basis, and in light of our previous analysis regarding testamentary capacity, we hold the district court did not abuse its discretion.

**C.  The district court did not err in dismissing Count One which alleged undue influence.**

Appellants argue the district court erred in dismissing Count One, undue influence, for which Appellants sought a declaration nullifying the transfer by Joan of her membership interest in the LLC to Jonathan. "A will may be held invalid on the basis of undue influence where sufficient evidence is presented indicating that the testator's free agency was overcome by

27

another." *Estate of Conway*, 152 Idaho at 938, 277 P.3d at 387. Establishing that undue influence produced an instrument requires proof of four elements: "(1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." *Gmeiner v. Yacte*, 100 Idaho 1, 6–7, 592 P.2d 57, 62–63 (1979)).

At the initial summary judgment, the district court determined a genuine issue of material fact existed on the second element–opportunity–but concluded Appellants failed to prove a genuine issue of material fact on the remaining elements. For the reasons below, we hold the district court did not err in reaching this conclusion.

        *a. Whether the district court correctly determined the presumption of undue influence did not apply.*

Appellants argue the district court erred by not applying a presumption of undue influence, which they contend was triggered because of the fiduciary relationship between Jonathan, Jack H., and Joan. Appellants also maintain that because the conveyance occurred "suddenly" and "after a period of time" when Jonathan lived with Jack H. and Joan, this created "suspicious circumstances" or a nexus sufficient to establish the presumption. In addition, Appellants argue the disproportionate nature of the change in estate plan alone creates a nexus. We are not persuaded.

"[A] rebuttable presumption of undue influence is created where a beneficiary of the testator's will is also a fiduciary of the testator." *Estate of Smith*, 164 Idaho 457, 474, 432 P.3d 6, 23 (2018) (citations omitted). "A presumption of undue influence arises if the alleged wrongdoer was in a confidential relationship with the donor and there were suspicious circumstances surrounding the preparation, formulation, or execution of the donative transfer[.]" *Green*, 161 Idaho at 681, 389 P.3d at 967. That said, the presumption does not arise unless the opponents of an instrument show some nexus between the fiduciary relationship and the execution of the donative instrument. *Id.* at 680, 389 P.3d at 966. Likewise, the presumption does not apply "simply because the grantor is old, physically infirm or uneducated." *Gmeiner*, 100 Idaho at 7–8, 592 P.2d at 63–64. Even if the alleged undue influencer had a confidential relationship with and was a close relative of the grantor, that fact—standing alone—does not establish grounds for voiding a conveyance. *Mollendorf v. Derry*, 95 Idaho 1, 3, 501 P.2d 199, 201 (1972).

28

Below, the district court examined Appellants' arguments at summary judgment and declined to apply the presumption of undue influence, reasoning that Appellants failed to show any connection between Jonathan's role as a co-manager of the LLC and the execution of the wills or conveyance. The district court explained Appellants "fail to provide any evidence of how Jonathan used his fiduciary duty as a co-manager of the LLC to induce or encourage his parents to execute the testamentary interests or the [g]ifts of [m]embership [i]interest." We agree.

Appellants fail to point to any evidence in the record to show a connection between Jonathan's role as the co-manager for the LLC and the conveyance—a necessary requirement to trigger the presumption of undue influence. The mere fact that Jonathan was a co-manager does not establish a nexus between that fiduciary relationship and Jack H. and Joan's execution of the donative instruments.

Appellants also argue that the disproportionate nature of the conveyance and change in estate plan was suspicious. While a disproportionate change in circumstances can provide some evidence of undue influence, more is required. For example, such evidence provides no explanation for how the change in estate plan, including its disproportionate nature, is in any way related to Jonathan's position as co-manager of the LLC. Accordingly, the district court did not err in failing to apply this presumption because Appellants' mere contention that the change in estate plan disproportionately benefited Jonathan, without more, does not establish the necessary nexus.

*b. Whether there is a genuine dispute of material fact as to susceptibility.*

Appellants next argue the district court erred in finding Appellants failed to raise an issue of material fact as to susceptibility. In support, Appellants contend Joan admitted she trusted Jonathan and acknowledged to Dr. Vegwert that Jonathan was willing to be a guardian for Jack H. and Joan should the need arise. Respondents counter that simply because Joan truthfully stated she trusted Jonathan and that he was willing to serve as a guardian does not create a disputed issue of fact.

"Susceptibility, as an element of undue influence, concerns the general state of mind of the testator: Whether he was of a character readily subject to the improper influence of others." *Gmeiner*, 100 Idaho at 7, 592 P.2d at 63. "Because of inevitable problems in establishing the subjective state of mind of a decedent, it is said to be the most difficult element to establish." *Id*. "The court will look closely at transactions where unfair advantage appears to have been taken of one who is aged, sick or enfeebled." *Id.*

29

While Appellants concede in their briefing that Dr. LaCroix needed to examine Joan to determine whether she was susceptible to undue influence, they contend Dr. LaCroix's expert testimony was enough to establish that Joan was susceptible to undue influence. But Appellants repeatedly argued below, and now on appeal, that new testing was "the only way for [Dr.] LaCroix to formally evaluate and opine on the question of susceptibility to undue influence, which is a material issue in this case." At the same time, Appellants simultaneously argue that Dr. LaCroix's testimony "demonstrates Joan's susceptibility" to undue influence. The district court determined there "is scant evidence to support the[ ] conclusory statements" from Dr. LaCroix. We agree. Similarly, the statements of Joan to Dr. Vegwert that she trusted Jonathan are of little consequence in establishing the susceptibility factor of undue influence, which requires some evidence to suggest Joan was subjected to improper influence by Jonathan. The mere statement from an elderly parent that they "trust" a child does not permit the court to make the logical leap that the parent is susceptible to undue influence. For obvious and important reasons, much more is required.

For example, in *Matter of Estate of Smith*, 164 Idaho at 476, 432 P.3d at 25, we upheld the lower court's finding of susceptibility to undue influence when the testator prepared her will on advice of her son, who had managed her legal and financial affairs for years. *Id*. at 463, 432, P.3d at 12. Her son was also the only person present when the testator made the changes to her will. *Id.* at 464. 432 P.3d at 13. Here, in contrast, Jack H. and Joan made the changes to their estate plans apparently without Jonathan's knowledge and with the advice of independent and disinterested legal counsel. *See In re Estate of Conway*, 152 Idaho at 940, 277 P.3d at 387 ("[M]ost importantly, the court found that [the testator] had independent and disinterested advice from [counsel] in creating the 2004 will."). The circumstances surrounding the estate changes do not support Appellants' argument that Joan was susceptible to undue influence.

For these reasons, we affirm the district court's decision that Appellants failed to raise a genuine dispute of material fact as to Joan's susceptibility.

         *c.   Whether there is a genuine dispute of material fact as to disposition to unduly influence.*

Appellants argue that they created a genuine dispute of material fact as to disposition for two reasons: (1) Jonathan lived with Jack H. and Joan and isolated them from the rest of the family; (2) there is ample circumstantial evidence showing Jonathan played a role in the conveyance. Respondents acknowledge that Jonathan lived with Jack H. and Joan but maintain this was during

a brief period between 2009 and 2010—several years before the time at issue. Respondents also counter that Appellants put forth no evidence to support the allegation that Jonathan isolated Jack H. and Joan.

Under the disposition element, the court "examines the character and activities of the alleged undue influencer to determine whether his conduct was designed to take unfair advantage of the testator." *Gmeiner v. Yacte*, 100 Idaho 1, 8, 592 P.2d 57, 64 (1979). "Disposition," in this sense, must mean more than just the performance of acts of kindness accompanied by the hope of material gain. Here, it must suggest that there is an ulterior motive behind the acts of kindness beyond filial love.

> One factor which assumes critical importance is whether the alleged undue influencer took an active part in preparation and execution of the will or deed. The beneficiary of a grantor's largesse will be viewed more suspiciously if they have been active in encouraging the transfer, in contacting the attorney or in preparing and typing the documents.

*Id.*

Below, Appellants asserted the "record in the present case is replete with evidence" that Jonathan isolated Jack H. and Joan. On appeal, Appellants make similarly broad allegations, contending "there is ample circumstantial evidence" to support their claim. Even so, Appellants really point to only three specific allegations, each of which we find unavailing. First, Appellants assert Jonathan drove Jack H. and Joan to Fitzgerald's office for their estate planning. Respondents do not dispute this. Instead, Respondents acknowledge Jonathan first drove Jack H. and Joan to Fitzgerald's office on May 30, 2017—*after* the estate plan had been changed, and Appellants do not point to any specific information in the record to contest this. The district court determined there was no evidence that Jonathan suggested or directed the will changes or gifts or was even aware of the decision to do so until after they were made.

Second, Appellants point to Jonathan's use of the LLC proceeds to fund his divorce as evidence of Jonathan's willingness to take unfair advantage of Jack H. and Joan. Even so, this evidence does not support the disposition requirement of undue influence. Jack S. and other members of the LLC agreed to pay the divorce settlement from the LLC funds to settle the divorce in 2009—six years before the first change to Jack H.'s and Joan's estate plans. Further, Jack S. continues to receive equalization distributions from the LLC as a result of the divorce settlement, which he does not appear to challenge. To argue now that the settlement stemmed from Jonathan's

31

undue influence over Jack H. and Joan when Jack S. and the LLC agreed to it in 2009 is without merit. Likewise, though Appellants contend the LLC experienced damage because of the LLC's contribution to Jonathan's settlement, they fail to mention that Jack S. continues to benefit from equalization payments from the settlement—and that he will continue to do so until 2024.

Third, Appellants argue the evidence suggests Jonathan alienated the affection of Joan and Jack H. and that there was no evidence of animus between the parents and Jack S. until Jonathan moved in with them. The district court did not find any evidence to support this allegation, nor do we. The district court scrutinized the example put forth from Janice of an instance between 2004 and 2006 in which she alleged Jonathan "wound up" their parents, but the district court concluded that simply "because her parents repeatedly brought up a matter that was annoying to her, doesn't mean they were unduly influenced by Jonathan or that they were incapacitated." We agree.

As a result, we conclude that the district court did not abuse its discretion in determining there were no genuine issues of material fact as to the element of disposition.

> d. *Whether there is a genuine dispute of material fact as to the result.*

Finally, Appellants argue the district court erred in finding Appellants did not create a genuine dispute of material fact associated with the result of the conveyance. "A result is suspicious if it appears 'unnatural, unjust or irrational.'" *Gmeiner*, 100 Idaho at 7, 592 P.2d at 63. That said, "[a] grantee may be particularly deserving by reason of long years of care and the fact 'that the grantor was motivated by affection or even gratitude does not establish undue influence.'" *Id.* (quoting *Mollendorf*, 95 Idaho at 3, 501 P.2d at 201).

Appellants assert this Court's holding in *Matter of Estate of Smith*, 164 Idaho at 476 432 P.3d at 25, supports their argument. In *Smith*, this Court held that a complete disinheritance of decedent's two children satisfied the unnatural disposition element of undue influence. *Id.* at 479, 432 P.3d at 28. Appellants argue the same factual circumstance unfolded here, for which Jack H. and Joan progressed from promising or representing to the family their interest in the LLC would be split between the brothers to a change in which Jack S. was essentially disinherited. As a result, Appellants contend this presents ample evidence of a genuine dispute of material fact over the result element. The district court examined this and concluded that Jack H. and Joan articulated valid reasons for the change.

"[T]he law must respect even an 'unequal and unjust disposition' once it is determined that such was the intent of the grantor or testator." *Smith*, 164 Idaho at 478, 432 P.3d at 27. And

important to this factor, Appellants neglect to mention that Jack S. and Janice were not completely disinherited—as were the children in *Smith*. Jack S. received a lump-sum LLC distribution of $100,000 in 2015, and additional continuous payments of $1,502.51 per month from the LLC until February 21, 2024. Even after the transfer, Jack S. remained a 30% interest holder in the LLC, which is valued at more than one million dollars. *Id.* Similarly, a ten-acre parcel, including a home worth an estimated $300,000 to $400,000 was placed in trust to benefit Janice, who also received a $132,000 cash payout from Jack H.'s life insurance policy. *Id.* Both Jack S. and Janice are the recipients of substantial assets received either from their parents or from the LLC. Thus, this case is much different than *Smith*.

As a result, we agree with the district court's conclusion that there was nothing "unnatural, unjust or irrational" about the change to estate plans, particularly when viewed in light of the unrefuted testimony of attorney Fitzgerald. Accordingly, we affirm the district court's decision on undue influence.

**D.     The district court did not err in dismissing Appellants' Count Two (Accounting), Four (Injunctive Relief), and Five (Constructive Trust).**

Because we hold the district court did not err in dismissing counts one and three, there is no need to address the issues raised on appeal concerning Counts Two, Four, and Five. Absent a finding of wrongdoing on the part of Respondents, there is no need for an accounting, injunctive relief, or a constructive trust.

**E.     We decline to formally adopt a new tort for intentional interference with an expected inheritance.**

Appellants argue Idaho should follow the majority of other states and formally adopt a new tort for intentional interference with an expected inherence ("IIEI"). Respondents counter that even if this Court elects to recognize IIEI, this is not the case to do so. We agree with Respondents and decline to adopt IIEI on these facts. The district court dismissed Count Six of Appellants' complaint because Idaho does not recognize IIEI. The district court was correct, but we will briefly explain why we decline to adopt this tort at this time.

*a.   A brief history of IIEI.*

The tort of IIEI has become widely recognized; twenty-five of the forty-two states that have considered it have adopted it. *Beckwith v. Dahl*, 141 Cal.Rptr.3d 142, 151, 205 Cal.App.4th 1039, 1050 (Cal. App. 4 Dist.,2012); *see also* John C.P. Goldberg & Robert H. Sitkoff, *Torts and Estates: Remedying Wrongful Interference with Inheritance*, 65 STAN. L. REV. 335, 361 (2013).

IIEI is considered an extension of intentional interference with contractual relations, which this Court has recognized. *See Barlow v. International Harvester Co.*, 95 Idaho 881, 893, 522 P.2d 1102, 1114 (1974), *abrogated on other grounds by Siercke v. Siercke*, 167 Idaho 709, 476 P.3d 376 (2020). This Court has also recognized interference with a prospective economic advantage, which differs from intentional interference with contract only in the type of relationship allegedly interfered with. *See Highland Enterprises, Inc. v. Barker*, 133 Idaho 330, 339, 986 P.2d 996, 1005, n.2 (1999) (discussing the similarities). Like intentional interference with prospective economic advantage, IIEI is considered an extension in tort to the noncontractual relationship principles present in intentional interference with contract. REST.2D TORTS, § 774B (1979) (cmt. A).

Though iterations of the tort appear in early case law,[5] IIEI was not widely recognized until 1979 when the RESTATEMENT (SECOND) OF TORTS defined it as follows:

> One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

REST. 2D TORTS, § 774B. We examined this formulation in *Losser v. Bradstreet* and declined to adopt it. In *Losser*, we recognized that to establish a prima facia case for recovery under the tort, a would-be legatee or heir must prove: (1) the existence of the expectancy, (2) that the defendant intentionally interfered with the expectancy; (3) that the interference consisted of conduct tortious in itself, such as fraud, duress, or undue influence; (4) that, with reasonable certainty, the plaintiff would have received the inheritance but for the defendant's interference; and (5) damages. *Losser v. Bradstreet*, 145 Idaho 670, 676, 183 P.3d 758, 764 (2008) (citing Jonathan M. Purver, *Interference With Right to Share of Decedent's Estate*, 39 AM.JUR. PROOF OF FACTS 2D 177, 184–85 (1983 Supp.2007)).

IIEI garnered national attention when the United States Supreme Court acknowledged it as "widely recognized" in *Marshall v. Marshall*, 547 U.S. 293, 297 (2006). To that end, most states that recognize it have adopted the formulation set out in the Second Restatement that we analyzed in *Losser*. For example, when the California Court of Appeals adopted it in *Beckwith*, the court supported its decision by explaining the tort was developed under the "general principle of law that whenever the law prohibits an injury it will also afford a remedy." *Beckwith v. Dahl*, 141

---

[5] *See, e.g.*, *Kelly v. Kelly*, 10 La. Ann, 622, 622–23 (1855).

Cal.Rptr.3d 142, 152 (Cal. App. 4 Dist. 2012) (quoting *Allen v. Lovell's Adm'x*, 197 S.W.2d 424, 426 (Ky. 1946).

Still, the California court recognized there was a policy concern associated with adopting the tort, explaining that sanctioning IIEI "could enable plaintiffs to usurp a testator's true intent by bypassing [ ] stringent probate requirements." *Beckwith v. Dahl*, 141 Cal. Rptr. 3d 142, 153 (Cal. App. 4 Dist. 2012). It is this policy concern that gives this Court—as well as other jurisdictions that have declined to adopt it—pause.

Even among the states that have adopted IIEI, not all have embraced the remedy fully, opting instead to limit the cause of action to exceptional circumstances in which other forms of relief are otherwise unavailable. For example, some states only permit a claim for IIEI when other probate system remedies are inadequate or unavailable. *See, e.g.*, *Plimpton v. Gerrard*, 668 A.2d 882, 886 (Me. 1995); *see also* Diane J. Klein, *Survey with Analysis in the Mountain States*, 45 IDAHO L. REV. 1 (2008) (analyzing the cases that have examined IIEI and the reasons for adopting or declining the tort).

IIEI has received criticism from states that decline to recognize it. For example, in *Archer v. Anderson*, the Supreme Court of Texas declined to recognize IIEI, explaining that existing law provided adequate remedies and that the tort would conflict with Texas probate law. *Archer v. Anderson*, 556 S.W.3d 228, 229 (Tex. 2018). In *Hauck v. Seright*, 964 P.2d 749, 753 (Mont. 1998), the Montana Supreme Court declined to recognize IIEI and determined the district court did not err in allowing the party's claim on undue influence to move forward instead. *Hauck v. Seright*, 964 P.2d 749, 753 (Mt. 1998). Finally, the Washington Court of Appeals declined to adopt IIEI in *In re Estate of Hendrix*, 2006 WL 2048240, at *1 (Wash. 2006) on the facts of the case presented.

### b. Appellants' case and IIEI

It is the criticism from the jurisdictions that have examined this remedy and declined to adopt it that ultimately leads us to conclude the facts here do not support extending the law to adopt this tort in Idaho. Ranking high among our concerns is its potential conflict with inheritance law. *See, e.g.*, John C.P. Goldberg & Robert H. Sitkoff, *Torts and Estates: Remedying Wrongful Interference with Inheritance*, 65 STAN. L. REV. 335, 361 (2013) (Part III discussing redundancy of IIEI). It is a hallmark of trust and estate law that a person is free to dispose of property as they wish—including to disinherit a child. "The right of a property owner to dispose of his or her property on terms that he or she chooses has come to be recognized as a separate stick in the bundle

of rights called property." Robert H. Sitkoff, *Trusts and Estates: Implementing Freedom of Disposition*, 58 ST. LOUIS U. L.J. 643, 644 (2014). Moreover, in this area of jurisprudence, "a prospective beneficiary has a mere expectancy that is subject to defeasance at the donor's whim." *Id*. Indeed, the prospective beneficiary "being derivative of the donor's freedom of disposition, does not harden into a cognizable legal right until the donor's death." *Id*. In essence, Appellants ask us to undermine the freedom of living donors to divide their estate how they see fit by breathing life into a cause of action that can only accrue after the donor's death. We decline to do so.

Perhaps most notably, we are disinclined to recognize a new cause of action from these facts because an alternative remedy is already available. For example, in the proceedings below, Appellants filed a cause of action for a constructive trust—Count Five. While the district court dismissed this claim on summary judgment, and we affirm that decision, in proper cases, the claims asserted by Appellants here remain the most suitable remedy for a party to pursue assets that are allegedly obtained through undue influence.

For these reasons, we decline to adopt IIEI as a recognized tort in Idaho.

**F.      The district court erred in granting summary judgment on Count Seven for dissolution of the LLC**

Appellants argue the district court incorrectly dismissed Count Seven, the claim for dissolution, and then inappropriately declared that Jack S. and Matthew were no longer members of the LLC as a result of seeking dissolution.

Appellants amended their complaint, seeking dissolution of the LLC. Respondents sought summary judgment of this claim based on language within the LLC operating agreement regarding the impact of a member's formal withdrawal. The district court granted the motion based on Respondents' argument.

Pursuant to Idaho's Uniform Limited Liability Company Act, operating agreements are permitted to define how a member may be dissociated from an LLC. I.C. § 30-25-602(2)(4) ("A person is dissociated as a member when: . . . (2) An event stated in the operating agreement as causing the person's dissociation occurs[.]").

The LLC's operating agreement defines "involuntary withdrawal" as occurring if:

(iv) the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation.

36

According to the district court, because Appellants filed an action to dissolve Nelsen Farms, Jack S. and Matthew were immediately dissociated from the company. And, because another section of the operating agreement allows a 66.67% member to remove a managing member upon that managing member's involuntary withdrawal, the district court permitted Jack S.'s removal while granting summary judgment against dissolution of the LLC.

Initially, Appellants maintain the district court declared Jack S. and Matthew were no longer members even though nothing in Respondents' pleadings expressly or impliedly sought such relief. In response, Respondents allege they extensively argued that Jack S. and Matthew were involuntarily dissociated and, therefore, no longer members of the LLC. Even more, Respondents contend that Appellants vehemently litigated this issue before the district court and have thereby expressly consented to it being adjudicated. We conclude that this question was properly at issue before the district court and that it is properly before us now. *See Lindberg v. Roseth*, 137 Idaho 222, 226–27, 46 P.3d 518, 522–23 (2002) (explaining that an issue is properly before a lower court if the parties impliedly consent to litigating the issue). Even so, we conclude the district court erred in granting summary judgment on this claim.

Operating agreements are contracts. *Lamprecht v. Jordan, LLC*, 139 Idaho 182, 186, 75 P.3d 743, 747 (2003). When the language of a contract is unambiguous, its interpretation is a question of law. *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 190, 108 P.3d 332, 337 (2005) "An unambiguous contract will be given its plain meaning. The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered. In determining the intent of the parties, this Court must view the contract as a whole." *Id.* If a contract is ambiguous, "interpretation of the contract is a question of fact that focuses on the intent of the parties." *Opportunity, LLC. v. Ossewarde*, 136 Idaho 602, 605, 38 P.3d 1258, 1261 (2002).

The district court found that "Jack [S.] Nelsen having filed with others an action for dissolution of the LLC has triggered his involuntary withdrawal from the LLC." The district court also noted that "once dissociation has occurred the dissociated member no longer has the right to participate in the management or conduct of the activities of the LLC."

First, neither party argues the text of the Agreement is ambiguous. Even so, both parties have competing interpretations of the clause cited above. "[I]n determining whether a contract is ambiguous, our task is to ascertain whether the contract is reasonably subject to conflicting interpretation." *Fletcher v. Lone Mountain Rd. Ass'n*, 162 Idaho 347, 353, 396 P.3d

37

1229, 1235 (2017) (quoting *Bondy v. Levy*, 121 Idaho 993, 997, 829 P.2d 1342, 1346 (1992)). *See also Kunz v. Nield, Inc.,* 162 Idaho 432, 439, 398 P.3d 165, 172 (2017) ("A contract term is ambiguous when there are two different, reasonable interpretations of the language."). We hold that although both parties have differing subjective views of section (iv), the provision is not reasonably subject to conflicting interpretations, and thus it is not ambiguous. "Ambiguity is not established merely because the parties present differing interpretations to the court." *Hayden Lake Fire Prot. Dist. v. Alcorn*, 141 Idaho 307, 312, 109 P.3d 161, 166 (2005); *see Swanson v. Beco Const. Co., Inc.*, 145 Idaho 59, 63, 175 P.3d 748, 752 (2007) ("A party's subjective, undisclosed interpretation of a word or phrase cannot make the contract ambiguous."); *River Range, LLC v. Citadel Storage, LLC*, 166 Idaho 592, 599, 462 P.3d 120, 127 (2020) ("courts will give full force and effect to the words of the contract without regard to what the parties of the contract thought it meant or what they actually intended it to mean.") (internal quotations omitted).

Respondents contend that the language in section (iv) referring to "for the Member" pertains to a member, like Jack S. or Matthew, who voluntarily seeks dissolution of the LLC. Appellants argue alternatively that this text is not a trap door though which any member may be involuntarily dissociated by simply filing an action to dissolve the LLC. Instead, this language is intended to guard the LLC against adverse effects that might occur to the company on the occurrence of various events of financial insolvency *on the part of its members*, such as bankruptcy, an assignment of assets for the benefit of creditors, appointment of a receiver or liquidation.

In construing the plain language of section (iv) and giving full effect to the clause as a whole, we agree with Appellants' position. We view the clause as describing circumstances that implicate financial insolvency and bankruptcy of a member, which is not the case here. If we were to read the term "dissolution" as a segmented phrase together with "the member files a petition seeking. . .dissolution," as the district court did, and as Respondents encourage us to do, we would have to disregard all other terms in that section. While this Court lacks "the roving power to rewrite contracts," *Shawver v. Huckleberry Estates, LLC*, 140 Idaho 354, 362, 93 P.3d 685, 693 (2004), we also cannot overlook the plain meaning of the contract as a whole. Because neither Jack S. nor Matthew petitioned seeking judicial relief from a debt on their own behalf, and neither became bankrupt, insolvent, or subject to judicial proceedings involving the liquidation of their

38

assets, we hold the district court's determination that they were dissociated by filing their claim for dissolution was erroneous.

This conclusion is supported by the Missouri Court of Appeals' recent decision in *Nicolazzi v. Bone*, 589 S.W.3d 638 (Mo. Ct. App. 2019). Nicolazzi brought a declaratory judgment action seeking to determine his status as a member of an LLC. The trial court agreed with the defendant's argument, much like Respondents' here, that by filing such an action Nicolazzi committed an act of withdrawal from the LLC.

The Missouri Court of Appeals reversed the trial court because its conclusion would render the applicable LLC statute meaningless. The court noted that to hold otherwise would present

> a classic Catch-22 because if merely filing a petition to determine LLC member status automatically extinguishes member status, then correspondingly, any member who files a petition loses standing to have brought the petition in the first place. . . . This illogical result would nullify an appropriate avenue of challenging another member's status on the basis of that member's alleged wrongdoing.

*Id.* at 642 (citations omitted). We have the same situation here. Idaho's Limited Liability Company Act affords a member the right to dissolution, *see* Idaho Code section 30-25-701, but a member could never exercise that right under the LLC operating agreement because the moment they do, they would be dissociated from the company and would lack standing to pursue the statutorily afforded right. This would alter statutory rights, which an operating agreement cannot do.  Thus, the district court erred in granting summary judgment by construing section (iv) in the way it did.

In addition, our conclusion here is supported by the notion that "the operating agreement cannot vary the causes of dissolution stated" in the Act. *Events Causing Dissolution*, § 701, UNIF. LTD. LIABILITY CO. ACT (2013). Construing the operating agreement as the district court did limits a financially solvent member from seeking dissolution of the LLC, which is otherwise allowed by Idaho's LLC statute, s*ee* Idaho Code § 30-25-701(4), and the operating agreement, which provides that the company may be dissolved upon "the occurrence of any event described in I.C. §30-6-701 [recodified as section 30-25-701 in 2015]."

When the district court granted dissolution on summary judgment, Jack S. and Matthew were, *ipso facto* deprived of their membership interests and relegated to the status of economic interest holders, without the right to petition for dissolution since, under the statute, only members may do so. *See* Idaho Code §30-25-701(4). Jack S. and Matthew are hereby reinstated as members of the LLC, and both have the right to seek dissolution under this statute upon remand.

## VI. CONCLUSION

The district court's summary judgment decision is affirmed as to Counts One through Six and reversed as to Count Seven. Neither party requested attorney fees on appeal. Because both parties prevailed in part, no costs are awarded on appeal.

JUSTICES BRODY, STEGNER, MOELLER, and ZAHN concur.